**Troy S. SMART, Appellant,**

v.

**STATE of Alaska, Appellee.**

**Jayme Sobocienski, Appellant,**

v.

**State of Alaska, Appellee.**

**Nos. A–9025, A–9037.**

Court of Appeals of Alaska.

Oct. 27, 2006.

Quinlan Steiner (opening brief) and Linda K. Wilson (reply brief), Assistant Public Defenders, and Barbara K. Brink (opening brief) and Quinlan Steiner (reply brief), Public Defenders, Anchorage, for the Appellant in No. A–9025.

Joshua Fink, Public Advocate, Anchorage, as amicus curiae aligned with the Appellant. Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee in No. A–9025.

David W. Miner, Seattle, Washington, and Joshua Fink, Public Advocate, Anchorage, for the Appellant in No. A–9037.

Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee in No. A–9037.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

OPINION

MANNHEIMER, Judge.

In *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the United States Supreme Court held that, under the Sixth and Fourteenth Amendments, a criminal defendant has the right to trial by jury—including the right to demand proof beyond a reasonable doubt—on any issue of fact (other than a prior conviction) that will increase the maximum penalty to which the defendant may be subjected.

The question presented to this Court is whether the right to jury trial recognized in *Blakely v. Washington* should be applied retroactively—that is, whether this Court should grant relief to a defendant ·whose sentence was imposed in violation of *Blakely* if the defendant's conviction was already final when *Blakely* was issued (June 24, 2004).

Our answer to this question has two parts.

First, we must identify the law that governs our inquiry—the legal test for assessing the retroactivity of a federal constitutional decision like *Blakely.*

The Alaska Supreme Court has adopted a retroactivity test modeled after the test endorsed by the United States Supreme Court in *Linkletter v. Walker.*[1] But in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the United States Supreme Court abandoned the *Linkletter* test in favor of a stricter test—*i.e.*, one that grants retroactivity in fewer instances.

The State argues that, under the supremacy clause of the federal Constitution, we are now bound to apply the *Teague* test when assessing whether a federal constitutional decision should be applied retroactively in state criminal cases. We conclude that the State is wrong. For the reasons explained here, we conclude that the *Teague* test applies only to federal habeas corpus litigation, that it does not bind the states, and that this Court is therefore obliged to apply the retroactivity test adopted by the Alaska Supreme Court.

Having concluded that we must apply the Alaska retroactivity test, the next question is whether, under the Alaska test, *Blakely* should be applied retroactively. We conclude that one component of *Blakely*—its requirement of proof beyond a reasonable doubt—is essential to a fair and lawful determination of a defendant's sentence under Alaska's presumptive sentencing law. Accordingly, we hold that this component of *Blakely* must be applied retroactively.

Finally, given the central importance of the guarantee of jury trial in our criminal justice system, we conclude that if one or more aggravators in a case must be relitigated because of a *Blakely* error in the standard of proof, the defendant is entitled to have a jury decide the disputed aggravators.

Part I:

What Law Governs This Court's Decision?

*Are state courts bound by the retroactivity test announced in Teague v. Lane when a state prisoner seeks the benefit of a new federal constitutional rule?*

■ The Alaska Supreme Court has repeatedly addressed the question of whether, when a new rule is created or recognized by judicial decision, that rule should be applied retroactively—that is, applied to defendants whose convictions were already final before the rule was announced.[2]

(For purposes of this discussion, a criminal conviction is "final" if there is no further possibility of direct review or certiorari review of the conviction. *See Beard v. Banks,* 542 U.S. 406, 411, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494 (2004); *Caspari v. Bohlen,* 510 U.S. 383, 390, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994).)

■ The Alaska Supréme Court most recently summarized our state's retroactivity test in *State v. Semancik.*

---

1. *See Judd v. State,* 482 P.2d 273, 277–78 (Alaska 1971), adopting the test set forth in *Linkletter v. Walker,* 381 U.S. 618, 636–38, 85 S.Ct. 1731, 1741–42, 14 L.Ed.2d 601 (1965).

2. *See State v. Semancik,* 99 P.3d 538, 543 (Alaska 2004); *State v. Wickham,* 796 P.2d 1354, 1358–59 (Alaska 1990); *State v. Glass,* 596 P.2d 10, 12–13 (Alaska 1979); *Judd v. State,* 482 P.2d 273, 278 (Alaska 1971).

We consider three factors when deciding whether to apply a new rule retroactively or prospectively: (1) the purpose to be served by the new rule; (2) the extent of reliance on the old rule; and (3) the effect on the administration of justice of a retroactive application of the new rule.

*Semancik,* 99 P.3d 538, 543 (Alaska 2004).

This test is modeled after the retroactivity test endorsed by the United States Supreme Court in *Linkletter v. Walker,* 381 U.S. 618, 636–38, 85 S.Ct. 1731, 1741–42, 14 L.Ed.2d 601 (1965). And, because this test has been adopted by our state supreme court, this Court is presumptively obliged to apply this test when deciding whether a new rule should be applied retroactively.

But the United States Supreme Court announced a new retroactivity test in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). In the cases currently before us, the State argues that we (and all other state courts) are now obliged to follow the *Teague* retroactivity test whenever we decide the potential retroactive application of a new rule of federal law—such as the Sixth Amendment right to jury trial announced in *Blakely.*

We conclude that the State has misinterpreted *Teague.* Although the *Teague* decision deals with the issue of retroactivity, *Teague* was not intended to limit the authority of a state court to retroactively apply rules of constitutional law when reviewing its own state's criminal convictions. Rather, as we explain here, the *Teague* decision was intended to limit the authority of federal courts to overturn state criminal convictions in federal habeas corpus proceedings. The purpose of the *Teague* test is to minimize federal intrusion into state criminal proceedings—by greatly narrowing the instances in which a federal court is authorized to overturn a state criminal conviction based on a rule of law that did not come into existence until after the state criminal conviction became final.

### (a) The background and the content of the Teague decision

In order to understand the *Teague* decision, one must understand the context in which it arose. The purpose of *Teague* was to ameliorate a problem created by the federal Habeas Corpus Act of 1867—an act which gave federal courts the authority to grant habeas corpus relief to prisoners convicted of crimes in state court if their federal rights had been violated.

As this Court explained in *Grinols v. State,*[3] the United States Congress inaugurated modern post-conviction relief litigation when it passed the Habeas Corpus Act. Prior to the passage of this Act, there was essentially only one ground for seeking habeas corpus relief: the assertion that the court which entered the criminal judgement against the prisoner lacked jurisdiction to do so. But under the 1867 Act, a state prisoner could attack their criminal conviction in federal court by alleging a violation of any right guaranteed by federal law.[4]

In the 1950s and 1960s, the United States Supreme Court issued a series of decisions that significantly expanded the procedural rights guaranteed to state criminal defendants under the federal Constitution. As a result, state prisoners began to resort frequently to the federal courts, invoking the Habeas Corpus Act to challenge their state convictions.[5]

As detailed by the United States Supreme Court in *Wainwright v. Sykes,*[6] the Supreme Court responded with various procedural rules to forestall this habeas corpus litigation, or at least to defer federal consideration of state prisoners' claims until those claims had been presented to the state courts. These rules were not jurisdictional limitations on the authority of the federal courts;

---

**3.** 10 P.3d 600 (Alaska App.2000).

**4.** *Grinols,* 10 P.3d at 610.

**5.** *Id. See also Wainwright v. Sykes,* 433 U.S. 72, 78–79, 97 S.Ct. 2497, 2502, 53 L.Ed.2d 594 (1977).

**6.** 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

rather, these rules were equitable restrictions on the federal courts' exercise of their habeas corpus authority—restrictions designed to further the goals of federal-state comity and the fair and orderly litigation of state criminal cases.[7]

In *Sykes* itself, the Supreme Court held that a state prisoner normally could not ask the federal courts to adjudicate a claimed violation of the prisoner's federal rights if, because of a procedural default under state rules (*e.g.,* failure to make a contemporaneous objection at trial, or failure to raise the issue on direct appeal), the prisoner was barred from litigating this claim in state court.[8] The only exception to this rule of exclusion, the Supreme Court declared, was if the state prisoner could show good "cause" for failing to raise the issue properly in the state court, and resulting "prejudice" from the violation of the prisoner's federal rights.[9]

But although the *Sykes* "cause and prejudice" rule generally operated to restrict federal habeas corpus litigation, the rule encouraged habeas litigation in one respect. Under the *Sykes* rule, state prisoners remained free to challenge their state criminal convictions by invoking a new federal right that was recognized *after* the prisoner's conviction became final. This result followed from the fact that, if the federal right was truly "new" (in the sense that it was not merely a straightforward application of already recognized rights), then, by definition, the prisoner had good cause for not asserting this new federal right until it was announced.

This was the precise holding in *Reed v. Ross,* 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984): the Supreme Court declared that, when the judicial decision that established a state prisoner's federal claim was not issued until after the prisoner's conviction became final, the prisoner would have "cause" (under *Sykes* ) for failing to comply with state proce-

dural rules governing the raising and preservation of that federal claim. 468 U.S. at 13, 104 S.Ct. at 2909.

The *Ross* Court frankly acknowledged that, by its decision, it was imposing a cost on state courts—by expanding the federal courts' exercise of their habeas corpus authority to overturn state court convictions.[10] And the *Ross* Court recognized that it was striking a balance between competing societal interests:

> A [federal] habeas court's decision ... to review the merits of a state prisoner's constitutional claim, when the prisoner has failed to follow applicable state procedural rules in raising the claim, implicates two sets of competing concerns. On the one hand, there is Congress' expressed interest in providing a federal forum for the vindication of the constitutional rights of state prisoners. There can be no doubt that[,] in enacting [28 U.S.C.] § 2254, Congress sought to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action. [Citation omitted]
>
> On the other hand, there is the State's interest in the integrity of its rules and proceedings and the finality of its judgments, an interest that would be undermined if the federal courts were too free to ignore procedural forfeitures in state court. The criminal justice system in each of the 50 States is structured ... to resolve all questions incident to [the] determination [of guilt or innocence], including the constitutionality of the procedures leading up to the verdict.... [W]e have long recognized that ... considerations of comity and concerns for the orderly administration of criminal justice [sometimes] re-

---

**7.** *See Reed v. Ross,* 468 U.S. 1, 9, 104 S.Ct. 2901, 2907, 82 L.Ed.2d 1 (1984): "Our decisions have uniformly acknowledged that federal courts are empowered under 28 U.S.C. § 2254 to look beyond a state procedural forfeiture and entertain a state prisoner's contention that his constitutional rights have been violated. [Citations omitted] The more difficult question ... is: What standards should govern the exercise of the [federal]

court's equitable discretion in the use of this power?"

**8.** *Sykes,* 433 U.S. at 86–87, 97 S.Ct. at 2506.

**9.** *Id.,* 433 U.S. at 87–89, 97 S.Ct. at 2506–07.

**10.** *Ross,* 468 U.S. at 5, 104 S.Ct. at 2904–05.

quire a federal court to forgo the exercise of its habeas corpus power.

*Ross,* 468 U.S. at 10–11, 104 S.Ct. at 2907.

Despite its concerns for federal-state comity and the finality of state court judgements, the *Ross* Court resolved the issue in favor of allowing the federal courts to entertain the state prisoner's habeas corpus claim. The Court held that the *Sykes* requirement of "cause" is met when a defendant fails to raise a constitutional issue if the basis of that constitutional claim was not reasonably known to the defendant at the time.[11]

A mere five years later, the Supreme Court decided *Teague,* a decision that all but abrogated the habeas corpus authority granted to the federal courts in *Ross.*

(Technically, Justice O'Connor's lead opinion in *Teague* represented only a plurality of the Court, not a majority. However, this plurality opinion has subsequently been adopted by a clear majority of the Supreme Court. *See, e.g., Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990); *Butler v. McKellar,* 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990).)

In the five years between *Ross* and *Teague,* the membership of the Supreme Court changed. *Ross* was a five-to-four decision— and by 1989, the remaining dissenters in *Ross* had mustered the votes to pare back the scope of the federal habeas corpus relief that was granted in *Ross.*

The *Teague* decision accomplished this goal, not by renouncing the interpretation of good "cause" adopted in *Ross,* but rather by announcing a new retroactivity rule—a rule that essentially barred federal courts from granting habeas corpus relief to state prisoners whose claims were based on new rules of federal law, even though these prisoners could demonstrate good cause (as defined in *Sykes* and *Ross* ) for not raising their claims earlier.

In other words, *Teague* addresses the retroactivity of federal constitutional decisions, but in the specific context of a state prison-

er's effort to obtain federal habeas corpus relief based on a federal right that was announced after the prisoner's conviction became final in the state courts.

As we explained above, *Ross* held that such a claim circumvents the normal procedural bar erected by the "cause and prejudice" requirement of *Wainwright v. Sykes.* But the *Teague* plurality declared that it made no difference whether the petitioner (Teague) could show good cause for failing to raise his federal claim earlier—because, even if Teague's habeas corpus lawsuit was allowed to go forward, Teague would not be entitled to any relief.

According to the *Teague* plurality, the reason Teague was not entitled to relief is that a new federal constitutional rule should normally not be applied to defendants who are pursuing collateral attacks on criminal convictions that were already final when the new rule was announced. In criminal litigation, Justice O'Connor wrote, "considerations of finality [are] significant and compelling":

> Application of constitutional rules [that were] not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect.... "No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment [that provides] that a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation."

*Teague,* 489 U.S. at 309, 109 S.Ct. at 1074–75.[12]

In other words, *Teague* is premised on the principle that if the litigation of a criminal case complied with the law that was in existence at the time, and if the criminal judgement has become final, then there should be very few circumstances which compel a reexamination of the criminal judgement based

---

**11.** *Id.,* 468 U.S. at 14–15, 104 S.Ct. at 2909– 2910.

**12.** Quoting Justice Harlan's concurring and dissenting opinion in *Mackey v. United States,* 401 U.S. 667, 691, 91 S.Ct. 1171, 1179, 28 L.Ed.2d 404 (1971).

on new developments in constitutional law. A collateral attack on a final criminal judgement should be allowed, Justice O'Connor concluded, only if the new constitutional rule "[puts] certain kinds of primary, private individual conduct beyond the power of [the states to regulate through criminal legislation]" or unless the new constitutional rule "requires the observance of . . . procedures that are implicit in the concept of ordered liberty".[13]

According to the *Teague* plurality opinion, this second category is limited to new rules which "improve the pre-existing fact-finding procedures" to such an extent that their absence "implicate[s] the fundamental fairness of [a] trial"[14]—"new procedures without which the likelihood of an accurate conviction is seriously diminished".[15]

It is true that section IV of the *Teague* decision contains a discussion and criticism of the Court's prior decisions concerning retroactivity—in particular, the test announced in *Linkletter v. Walker.*[16] *See Teague,* 489 U.S. at 302–05, 109 S.Ct. at 1071–73.

Nevertheless, Justice O'Connor declared, the Court's decision to abandon *Linkletter* in favor of a more restrictive test was not based on the Court's views concerning the proper scope of retroactivity *per se.* Rather, the Court's main purpose in *Teague* was to fashion equitable limitations on the habeas corpus authority of the federal courts—the authority of the federal courts to overturn state court judgements:

> [The doctrine of] retroactivity for cases on collateral review [can] be responsibly determined only by focusing . . . on the . . . adjudicatory process in which [these] cases arise. *The relevant frame of reference, in other words, is not the purpose of the new [constitutional] rule whose benefit the de-*fendant *seeks, but instead the purposes for which the writ of habeas corpus is made available. . . .*

> Habeas corpus always has been a *collateral* remedy [that] provid[es] an avenue for [overturning] judgments that have become otherwise final. It is not designed as a substitute for direct review [of a criminal conviction]. [Because of this, the] interest in leaving [the underlying] litigation in a state of repose, . . . not subject to further judicial revision, may quite legitimately be found . . . to outweigh[,] in . . . most instances[,] the competing interest in readjudicating [criminal] convictions according to all [of the] legal standards in effect when a habeas petition is filed.

> [Rather,] it is sounder, in adjudicating habeas petitions, generally to apply the law prevailing at the time [the defendant's] conviction became final. . . .

*Teague,* 489 U.S. at 305–06, 109 S.Ct. at 1073 (emphasis added).[17]

Justice O'Connor then added that the scope of federal habeas corpus relief had never been defined "simply by reference to a perceived need to assure that an individual accused of crime is afforded a trial free of constitutional error".[18] Rather, she said, the Supreme Court has recognized that "interests of [federal-state] comity and finality [of criminal judgements] must also be considered in determining the proper scope of habeas review."[19] And, as we noted above, Justice O'Connor declared that "considerations of finality [are] significant and compelling . . . in the criminal [law] context".[20]

Quoting Professor Paul J. Mishkin, Justice O'Connor stated that the problem was "not so much one of prospectivity or retroactivity

---

**13.** *Teague,* 489 U.S. at 307, 109 S.Ct. at 1073 (quoting Justice Harlan's concurring and dissenting opinion in *Mackey,* 401 U.S. at 692–93, 91 S.Ct. at 1180).

**14.** *Teague,* 489 U.S. at 312, 109 S.Ct. at 1076.

**15.** *Id.,* 489 U.S. at 313, 109 S.Ct. at 1077.

**16.** 381 U.S. 618, 636–38, 85 S.Ct. 1731, 1741–42, 14 L.Ed.2d 601 (1965).

**17.** Quoting extensively from Justice Harlan's concurring and dissenting opinion in *Mackey v. United States,* 401 U.S. 667, 682–83, 689, 91 S.Ct. 1171, 1175, 1178, 28 L.Ed.2d 404 (1971).

**18.** *Teague,* 489 U.S. at 308, 109 S.Ct. at 1074.

**19.** *Id.*

**20.** *Id.,* 489 U.S. at 309, 109 S.Ct. at 1074.

of [a new constitutional] rule".[21]   Rather, the problem was to define the situations in which state prisoners could obtain "federal habeas corpus [review] to go behind [an] otherwise final judgment of conviction".[22]   Justice O'Connor concluded that

> [t]he costs imposed upon the States by retroactive application of new rules of constitutional law on habeas corpus ... generally far outweigh the benefits of this application.... In many ways the application of new rules to cases on collateral review may be more intrusive than the enjoining of criminal prosecutions, ... for it continually forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards.   Furthermore, as we recognized in *Engle v. Isaac,* "[s]tate courts are understandably frustrated when they faithfully apply existing constitutional law only to have a federal court discover, during a [habeas] proceeding, new constitutional commands."

*Teague,* 489 U.S. at 310, 109 S.Ct. at 1075 (quoting *Engle v. Isaac,* 456 U.S. 107, 128 n. 33, 102 S.Ct. 1558, 1572 n. 33, 71 L.Ed.2d 783 (1982)).

For these reasons, Justice O'Connor said, the *Teague* plurality favored adopting Justice Harlan's doctrine of narrow retroactivity for criminal cases on federal habeas review. *Teague,* 489 U.S. at 310, 109 S.Ct. at 1075.

Justice Brennan, who had authored *Reed v. Ross* a scant five years before, dissented from the decision in *Teague.*   He, too, clearly saw that the issue in *Teague* was not retroactivity *per se,* but rather the scope of federal habeas corpus review of state criminal convictions:

> Today a plurality of this Court, without benefit of briefing and oral argument, adopts a novel threshold test for federal review of state criminal convictions on habeas corpus.... [T]he plurality would for the first time preclude *the federal courts* from considering on collateral review a

vast range of important constitutional challenges ... [even when] those challenges have merit....

*Teague,* 489 U.S. at 326–27, 109 S.Ct. at 1084 (Brennan, J., dissenting) (emphasis added).

### *(b) Why we conclude that the Supreme Court did not intend the Teague retroactivity rule to be binding on state courts*

Having reviewed the context in which *Teague* was decided, and having closely examined the text of the *Teague* decision, we now turn to a fundamental issue that divides this Court:  Did the United States Supreme Court intend for the states to be bound by the *Teague* retroactivity test?

In its brief to this Court, the State argues that, under federal law, the retroactivity test announced in *Teague* governs state courts' application of new rules of federal constitutional law (such as the new interpretation of the Sixth Amendment right to jury trial announced in *Blakely* ).   Judge Coats, in his dissenting opinion, adopts this interpretation of *Teague.*

In reaching this conclusion, both Judge Coats and the State rely on the United States Supreme Court's decision in *American Trucking Associations, Inc. v. Smith,* 496 U.S. 167, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990).   In *American Trucking,* the Supreme Court stated:

> The determination [of] whether a constitutional decision of this Court is retroactive—that is, whether [it] applies to conduct or events that occurred before the date of the decision—is a matter of federal law.   [Although] state courts generally have the authority to determine the retroactivity of their own decisions ... [t]he retroactive applicability of a constitutional decision of this Court ... is every bit as much of a federal question as [the issues of

---

**21.** *Teague,* 489 U.S. at 309–310, 109 S.Ct. at 1075 (quoting Paul J. Mishkin, *Foreword: The High Court, the Great Writ, and the Due Process of Time and Law,* 79 Harvard L.Rev. 56, 77–78 (1965)).

**22.** *Id.*

substantive law resolved in the decision itself].

*Id.*, 496 U.S. at 177–78, 110 S.Ct. at 2330.

Based on this passage from *American Trucking,* Judge Coats and the State conclude that this Court is obliged, by federal law, to apply the *Teague* test when we decide whether to grant relief to defendants who were sentenced in violation of *Blakely* but whose convictions became final before the *Blakely* decision was issued.

But *American Trucking* merely says that, under the supremacy clause, state courts must follow any rule of retroactivity imposed on them by the Supreme Court. The underlying question that remains to be addressed—the question that *American Trucking* does not answer—is whether the Supreme Court intended the *Teague* retroactivity test to be binding on the states.

It is true that Justice O'Connor's opinion in *Teague* contains a discussion of the principles of retroactivity in general—*i.e.,* the principles employed to identify situations in which it is fair to apply or to withhold a new rule of law in criminal cases that have already been concluded. However, as we explained in some detail in the preceding section of this opinion, Justice O'Connor ended this discussion by declaring that, ultimately, the question of retroactivity had to be answered by examining "the purposes for which the [federal] writ of habeas corpus is made available".[23]

The *Teague* decision explicitly states that the problem the *Teague* plurality wished to resolve was "not so much one of prospectivity or retroactivity of [a new constitutional] rule", but rather the problem of defining the situations in which state prisoners might equitably demand "federal habeas corpus [review] to go behind [an] otherwise final judgment of conviction".[24] To resolve this problem, the *Teague* plurality fashioned a test that greatly narrowed the situations in which state prisoners could obtain retroac-

tive application of a new constitutional rule. The *Teague* test was consciously designed to promote federal-state comity and to preserve the states' "significant and compelling" interest in the finality of their criminal judgements.[25]

As the Supreme Court later explained in *O'Dell v. Netherland,* 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997), "At bottom, . . . the *Teague* doctrine validates reasonable, good-faith interpretations of existing precedents made by state courts[,] even though [the state court's interpretation of the law is] shown to be contrary to later decisions." *Id.,* 521 U.S. at 156, 117 S.Ct. at 1973.[26]

In other words, the *Teague* decision appears to derive from the same concerns about federal-state relations that motivated *Wainwright v. Sykes* and the various other decisions in which the Supreme Court placed equitable restrictions on the authority of federal courts to grant habeas corpus relief to state prisoners. *Teague* does not address the authority of state courts; rather, *Teague* restricts the authority of federal courts to overturn state criminal convictions.

This interpretation of *Teague* is confirmed by later decisions of the Supreme Court. The Supreme Court has repeatedly held that *Teague's* principle of non-retroactivity "is not jurisdictional in the sense that federal courts must raise and decide the issue *sua sponte* ". *Caspari v. Bohlen,* 510 U.S. 383, 389, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). Rather, *Teague* is a procedural defense that a state government may interpose in federal habeas corpus litigation, to prevent a federal court from reaching the merits of a state prisoner's constitutional claim.

Although the federal courts always have the *discretion* to consider whether to abstain from granting habeas relief if a state prisoner's claim fails the *Teague* test for retroactivity, a federal court becomes *obliged* to apply the *Teague* test only if the state raises the

---

23.  *Teague,* 489 U.S. at 306, 109 S.Ct. at 1073.

24.  *Id.,* 489 U.S. at 309–310, 109 S.Ct. at 1075 (quoting Paul J. Mishkin, *Foreward,* 79 Harvard L.Rev. at 77–78). (For the full citation to Prof. Mishkin's article, see footnote 21, *supra.*)

25.  *Teague,* 489 U.S. at 309, 109 S.Ct. at 1074.

26.  Quoting *Butler v. McKellar,* 494 U.S. 407, 414, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990).

*Teague* defense in a timely fashion. . *Bohlen,* 510 U.S. at 389, 114 S.Ct. at 953.

See *Godínez v. Moran,* 509 U.S. 389, 397 n. 8, 113 S.Ct. 2680, 2685 n. 8, 125 L.Ed.2d 321 (1993), and *Schiro v. Farley,* 510 U.S. 222, 228–29, 114 S.Ct. 783, 788–89, 127 L.Ed.2d 47 (1994)—both holding that a state forfeits the protection of *Teague* if the state fails to assert this procedural defense in a timely manner. And see *Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990), where the Supreme Court proceeded to decide the merits of a state prisoner's constitutional claim after the state's attorney expressly waived the protection of *Teague* during oral argument.

This principle—that *Teague* limits the authority of the federal courts but does not limit the authority of state courts—is also illustrated by the Supreme Court's decision in *Horn v. Banks,* 536 U.S. 266, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002).

Banks was a Pennsylvania prisoner who was convicted of several murders and sentenced to death. His convictions and his sentence were affirmed by the Pennsylvania Supreme Court, and his federal petition for writ of certiorari was denied in October 1987.[27]

Eight months later (in June 1988), the Supreme Court decided *Mills v. Maryland.*[28] In *Mills,* the Supreme Court held that, in death penalty cases, it was unconstitutional to require the jurors to unanimously agree that a particular mitigating factor had been proved before allowing the jurors to consider that mitigating factor when deciding whether the defendant should receive the death penalty.

Following the decision in *Mills,* Banks filed for post-conviction relief in state court, arguing that the jury instructions in his case violated *Mills.* When Banks's case reached the Pennsylvania Supreme Court, the Penn-

sylvania court assumed (without engaging in a *Teague* analysis) that the *Mills* rule should be applied retroactively to Banks, but the court concluded that the jury instructions in Banks's case did not violate *Mills.*[29]

Banks then filed a federal petition for writ of habeas corpus. The federal district court denied relief, but the Third Circuit concluded that the jury instructions in Banks's case had, in fact, violated *Mills,* and thus the Third Circuit reversed Banks's death sentence.[30]

In this federal habeas litigation, the State of Pennsylvania argued that the federal courts should not reach the merits of Banks's claim because, even if Banks was right, the *Mills* rule was not retroactive under the *Teague* test—and, therefore, the federal courts were barred from granting habeas corpus relief to Banks.[31] But the Third Circuit concluded that *Teague* did not apply to Banks's case because the Pennsylvania Supreme Court had not relied on notions of retroactivity when it decided Banks's case; instead, the Pennsylvania court had reached the merits of Banks's *Mills* argument.[32] The Third Circuit held that, under these circumstances, *Teague* did not bar the federal courts from likewise reaching the merits of Banks's argument.[33]

The case then went to the Supreme Court. In *Horn v. Banks,* 536 U.S. 266, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) (*per curiam* ), the Supreme Court unanimously reversed the Third Circuit on the question of whether Banks's case was governed by *Teague.* The Supreme Court explained that, even in cases where the state courts reach the merits of a prisoner's federal constitutional claim, the federal courts remain obliged to apply the *Teague* restriction on retroactivity if the state government properly raises this procedural defense when the litigation moves to

---

27.  See *Beard v. Banks,* 542 U.S. 406, 408, 124 S.Ct. 2504, 2508, 159 L.Ed.2d 494 (2004).

28.  486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

29.  *Commonwealth v. Banks,* 540 Pa. 143, 656 A.2d 467, 470 (1995).

30.  *Banks v. Horn,* 271 F.3d 527 (3rd Cir.2001).

31.  *Id.,* 271 F.3d at 543.

32.  *Id.* at 541.

33.  *Id.* at 543.

federal court. *Banks*, 536 U.S. at 272, 122 S.Ct. at 2151.

For present purposes, the important thing about the Supreme Court's decision in *Horn v. Banks* is that the Supreme Court gave no hint that the Pennsylvania state courts committed error when they addressed the merits of Banks's constitutional claim without first considering whether the *Mills* decision was retroactive under the *Teague* test. Rather, the Supreme Court declared that the *Third Circuit* committed error when it addressed the merits of Banks's claim without first considering the *Teague* issue.

The Supreme Court's decision in *Banks*, as well as the Court's decisions in *Moran*, *Schiro*, and *Youngblood*, all support the conclusion that *Teague* binds the federal courts when they consider a state prisoner's habeas corpus claim (assuming that the state government raises a timely *Teague* objection in federal court), but that *Teague* does not bind the state courts. State courts remain free to reach the merits of a prisoner's federal constitutional claim even when federal habeas corpus relief would be barred because of *Teague*.

We acknowledge that the courts of several other states have held that the *Teague* test governs state litigation. But most of these state courts have simply assumed, apparently without examining the issue, that *Teague* controls state litigation as well as federal habeas litigation. *See Johnson v. Warden*, 218 Conn. 791, 591 A.2d 407, 410 (1991); *Whisler v. State*, 272 Kan. 864, 36 P.3d 290, 296 (2001); *People v. Eastman*, 85 N.Y.2d 265, 624 N.Y.S.2d 83, 88–89, 648 N.E.2d 459, 464–65 (1995); *Agee v. Russell*, 92 Ohio St.3d 540, 751 N.E.2d 1043, 1046–47 (2001); *Thomas v. State*, 888 P.2d 522, 527 (Okla.Crim. App.1994); *Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761, 780 (2004); *State v. Gómez*, 163 S.W.3d 632, 650–51 (Tenn.2005); *Taylor v. State*, 10 S.W.3d 673, 679 (Tex. Crim.App.2000).

Among the state courts which *have* addressed the fact that there is a question concerning the scope of *Teague*, only a few have held that *Teague* binds the states. *See State v. Houston*, 702 N.W.2d 268, 270 (Minn. 2005), recently re-affirmed in *Danforth v. State*, 718 N.W.2d 451, 455 (Minn.2006); *State v. Egelhoff*, 272 Mont. 114, 900 P.2d 260, 267 (1995); *Page v. Palmateer*, 336 Or. 379, 84 P.3d 133, 136–38 (2004).

The majority of courts which have addressed this issue have concluded that *Teague* does not govern a state court's decision to grant retroactive application of a new constitutional rule in state post-conviction relief proceedings—that, instead, *Teague* binds only federal courts in federal habeas corpus proceedings.

*See People v. Bradbury*, 68 P.3d 494, 498 (Colo.App.2002) (asserting that a state court has the authority to adopt a different retroactivity rule, but declining to do so); *Johnson v. State*, 904 So.2d 400, 408–09 (Fla.2005) ("As courts in other states have noted, state courts are not bound by *Teague* in determining the retroactivity of decisions. . . . We continue to apply our longstanding *Witt* analysis, which provides more expansive retroactivity standards than those adopted in *Teague*."); *Figarola v. State*, 841 So.2d 576, 577 n. 1 (Fla.App.2003) ("The Supreme Court's opinion in *Teague* reflected that court's narrowing view of the rule of federal habeas corpus. The policy considerations behind *Teague* are not necessarily the same as those for state court post-conviction relief."); *People v. Flowers*, 138 Ill.2d 218, 149 Ill.Dec. 304, 561 N.E.2d 674, 682 (1990) (concluding that *Teague* applies only to federal habeas corpus litigation, but deciding to adopt *Teague* as a matter of state law); *State v. Mohler*, 694 N.E.2d 1129, 1132 (Ind.1998) ("*Teague* established the retroactivity standard for federal courts reviewing habeas corpus petitions for relief from state judgments. State courts [adjudicating] claims for collateral review . . . are free to set their own retroactivity rules independent of *Teague*."); *Brewer v. State*, 444 N.W.2d 77, 81 (Iowa 1989) (agreeing with the policy of *Teague* and adopting it as a matter of state law); *State ex rel. Taylor v. Whitley*, 606 So.2d 1292, 1296 (La.1992) ("[W]e are not bound to adopt the *Teague* standards."); *State v. Whitfield*, 107 S.W.3d 253, 267 (Mo.2003) ("It is up to each state to determine whether to apply the rule set out in *Teague*, [or] to continue to apply the rule set out in *Linkletter* . . ., or to apply yet

some other rule appropriate for determining [the] retroactivity of a new constitutional rule to cases on collateral review. So long as the state's test is not narrower than that set forth in *Teague,* it will pass constitutional muster."); *Colwell v. State,* 118 Nev. 807, 59 P.3d 463, 470–71 & n. 41 (2002) (*"Teague* is not controlling on this court, other than in the minimum constitutional protections established by its two exceptions.... States are free to provide greater protections in their criminal justice system than the Federal Constitution requires."); *State v. Lark,* 117 N.J. 331, 567 A.2d 197, 203 (N.J.1989) (concluding that, although the analogy between federal habeas corpus proceedings and state post-conviction relief proceedings was imperfect, the two types of post-conviction litigation were sufficiently similar that the court should follow the *Teague* retroactivity rule, at least in the case before the court); *State v. Evans,* 154 Wash.2d 438, 114 P.3d 627, 633 (2005) (holding that *Teague* is ultimately "grounded in important considerations of federal-state relations", and that *Teague* does not limit a state court's authority to grant post-conviction relief based on a retroactive application of *Blakely* ).

In addition to the decisions cited in the preceding paragraph, the words of the South Dakota Supreme Court in *Cowell v. Leapley,* 458 N.W.2d 514 (S.D.1990), are particularly noteworthy and instructive on this issue:

> The *Teague* decision ... arose in the context of interpreting federal habeas corpus law, a right granted through federal statutes.... The various states, including South Dakota, have created state rights of habeas corpus through statutes.... Each sovereign has the right to decide how it will allow access to this extraordinary remedy. The federal government controls how it permits access to the remedy in its courts, and South Dakota establishes grounds that will provide access to habeas corpus in our courts. Simply put, it was error [for the lower court] to hold that a federal decision on what criteria to apply for retroactive application of constitutional law in a federal habeas corpus proceeding

was controlling on a retroactivity question in a state habeas corpus proceeding.

*Cowell,* 458 N.W.2d at 517.

*See also Edwards v. People,* 129 P.3d 977, 981–82 (Colo.2006), and *State v. Tallard,* 149 N.H. 183, 816 A.2d 977, 979–981 (2003) (both courts recognizing the possibility that *Teague* does not bind the states, then circumventing the problem by deciding, as a matter of state law, to apply the *Teague* rule).

In his dissent, Judge Coats does not acknowledge these decisions (with the exception of the Washington Supreme Court's decision in *State v. Evans,* which he mentions at the end of a long footnote). The State, however, explicitly contends that all of these courts are wrong, and that the *Teague* rule *does* bind the states on the issue of whether federal constitutional decisions should be applied retroactively.

The State argues that the United States Supreme Court intended for the *Teague* retroactivity rule to be binding on the states to ensure "a uniform national definition of constitutional liberties". According to the State, a uniform definition of federal constitutional rights must include a uniform rule concerning the retroactive application of those rights. The State points out that if states are allowed to follow their own law regarding the retroactive application of new constitutional rules to defendants seeking post-conviction relief, defendants in different states will be treated differently.

It is true that if the states have different retroactivity rules, defendants seeking post-conviction relief under state law will meet with different results, depending on which state law governs their litigation. But the question is whether the United States Supreme Court intended to forbid this.

As we explained above, the primary motivation behind *Teague* was an effort to promote federal-state comity, and to protect the finality of state criminal convictions, by limiting the ability of federal courts to use the federal Habeas Corpus Act to overturn state criminal convictions based on new rules of law. This is how Justice O'Connor described the *Teague* opinion three years later:

*Teague* simply requires that a state conviction [under review in a] federal habeas [proceeding generally] be judged according to the law in existence when the conviction became final.

*Wright v. West,* 505 U.S. 277, 304, 112 S.Ct. 2482, 2497, 120 L.Ed.2d 225 (1992) (O'Connor, J., concurring). *See also Daniels v. United States,* 254 F.3d 1180, 1193 (10th Cir.2001) (*en banc* ) ("[T]he *Teague* rule was based in large part upon the need for federal courts to respect the decisions made by state courts.")

If the primary purpose behind *Teague* is to limit the scope of federal habeas corpus review of state criminal convictions, rather than to achieve uniformity of results among the states, then one would expect the Supreme Court not to care if a state government declined to assert its rights under *Teague*—thus allowing the federal courts to decide the merits of a state prisoner's claim for habeas corpus relief, even though the claim would otherwise be barred by *Teague.* And this is precisely what happened in a case we mentioned earlier, *Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990).

Youngblood was a state prisoner who was seeking federal habeas corpus relief based on a new rule of constitutional law. Even though *Teague* would apparently bar this litigation, "[t]he State of Texas ... did not address [the *Teague* ] retroactivity [issue] in its petition for certiorari or in its briefs on the merits, and when asked about the issue at oral argument, counsel [for Texas] answered that the State had chosen not to rely on *Teague.*" *Youngblood,* 497 U.S. at 40–41, 110 S.Ct. at 2718. The Supreme Court responded to this announcement by declaring that, given the position taken by the State of Texas, the Court would proceed to decide the merits of Youngblood's case:

> Although the *Teague* rule is grounded in important considerations of federal-state relations, we think it is not "jurisdictional" in the sense that this Court ... *must* raise and decide the [retroactivity] issue *sua sponte.* ... We granted certiorari to consider the merits of [Youngblood's] claim, and we proceed to do so.

*Youngblood,* 497 U.S. at 41, 110 S.Ct. at 2718 (emphasis in the original).

A few years later, in *Godínez v. Moran,* 509 U.S. 389, 397 n. 8, 113 S.Ct. 2680, 2685 n. 8, 125 L.Ed.2d 321 (1993), and again in *Schiro v. Farley,* 510 U.S. 222, 228–29, 114 S.Ct. 783, 788–89, 127 L.Ed.2d 47 (1994), the Supreme Court declared that the *Teague* rule created a procedural defense that state governments might raise if a state prisoner sought federal habeas corpus relief—and that this defense was forfeited if the state failed to assert it in a timely manner.

The Supreme Court's decisions in *Youngblood, Moran,* and *Schiro* are simply inconsistent with the State's assertion that the *Teague* rule was intended to achieve nationwide uniformity in the retroactive application of federal constitutional rules. By allowing the State of Texas to waive the protection of *Teague* in the *Youngblood* case, and by declaring that Nevada and Indiana had, through inaction, forfeited the protection of *Teague* in the *Moran* and *Schiro* cases, the United States Supreme Court expressly countenanced a non-uniform application of the *Teague* restrictions on retroactivity.

The Supreme Court's decisions in *Youngblood, Moran,* and *Schiro* confirm that the underlying aim of *Teague* is not to achieve a uniformity of results among the fifty states, but rather to impose equitable restrictions on the federal courts' exercise of their authority under the Federal Habeas Corpus Act to review state criminal convictions.

For these reasons, we reject the State's contention that we are bound by federal law to apply the *Teague* retroactivity test when we decide whether *Blakely's* expansion of the Sixth Amendment right to jury trial should be applied retroactively. Rather, we conclude that the *Teague* retroactivity test binds federal courts, not state courts.

*If we are not bound by the Teague rule, what law should we apply when deciding the retroactivity of Blakely?*

The Supreme Court's decision in *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), governs the retroactive application of *Blakely* to defendants whose

convictions were not yet final when *Blakely* was decided—because the *Griffith* rule of retroactivity expressly applies to all defendants, both state and federal, whose convictions are not final (*i.e.*, whose cases are still pending on direct review or certiorari review) when a new constitutional rule is announced.[34]

But the question confronting this Court is whether *Blakely* should be applied retroactively to state defendants whose convictions were already final when *Blakely* was decided (June 24, 2004). As we have just explained, no federal law governs our decision on this matter. We must decide this issue under state law.

As we noted at the beginning of this opinion, the Alaska Supreme Court has repeatedly addressed the question of whether, when a new rule is created or recognized by judicial decision, that rule should be applied retroactively. *See State v. Semancik*, 99 P.3d 538, 543 (Alaska 2004); *State v. Wickham*, 796 P.2d 1354, 1358–59 (Alaska 1990); *State v. Glass*, 596 P.2d 10, 12–13 (Alaska 1979); *Judd v. State*, 482 P.2d 273, 278 (Alaska 1971). The Alaska test for retroactivity is summarized in *Semancik*.

> We consider three factors when deciding whether to apply a new rule retroactively or prospectively: (1) the purpose to be served by the new rule; (2) the extent of reliance on the old rule; and (3) the effect on the administration of justice of a retroactive application of the new rule.

*Semancik*, 99 P.3d at 543.

This Alaska test for retroactive application of a new rule is modeled after the test endorsed by the United States Supreme Court in *Linkletter v. Walker*, 381 U.S. 618, 636–38, 85 S.Ct. 1731, 1741–42, 14 L.Ed.2d 601 (1965). It is true that the United States Supreme Court abandoned the *Linkletter* test in *Teague v. Lane*, but (as we have explained here) we are not bound by the *Teague* decision. Nevertheless, *Teague* does contain an extensive critique of the *Linklet-*

ter test. In *Teague*, Justice O'Connor asserted that the *Linkletter* test

> has not led to consistent results. Instead, it has been used to limit application of certain new rules to cases on direct review, other new rules only to the defendants in the cases announcing [those] rules, and still other new rules to cases in which trials [had] not yet commenced.

*Teague*, 489 U.S. at 302, 109 S.Ct. at 1071. As a consequence, Justice O'Connor wrote, "commentators have had a veritable field day with the *Linkletter* standard, with much of the discussion being more than mildly negative." *Id.*, 489 U.S. at 303, 109 S.Ct. at 1071.[35]

Moreover, several of the state courts that have recognized that they are not bound by the *Teague* retroactivity rule have nevertheless adopted the *Teague* rule as a matter of state law—either because they were troubled by the difficulties posed by the *Linkletter* rule, or simply because they wished to bring their state law into conformity with federal law on this subject.

But this Court is an intermediate appellate court. Whatever may be the relative advantages of preserving the *Linkletter* test, or abandoning *Linkletter* in favor of the *Teague* test, or even crafting an altogether different retroactivity test, the fact remains that we are bound by the precedent established by the Alaska Supreme Court. In other words, we must continue to apply the Alaska retroactivity rule as set forth and applied in such cases as *Semancik*, *Wickham*, *Glass*, and *Judd.*

The State, however, argues that this is not so. The State contends that the Alaska Legislature has decreed that we must apply the *Teague* test (as a matter of state law) whenever a defendant collaterally attacks a conviction or sentence.

The State points out that, in 1995, the legislature amended Alaska's post-conviction relief statute, AS 12.72.010, and the corresponding court rule, Alaska Criminal Rule 35.1(a), by adding language that appears to

---

**34.** *Griffith*, 479 U.S. at 323–24, 328, 107 S.Ct. at 713–14, 716.

**35.** Quoting Francis X. Beytagh, *Ten Years of Non–Retroactivity: A Critique and a Proposal*, 61 Va. L.Rev. 1557, 1558 & n. 3 (1975).

codify a retroactivity test that is similar, if not identical, to the one announced in *Teague*.[36] As amended, both the statute and the rule now contain a subsection (7); this subsection declares that post-conviction relief is available if a defendant shows that:

(A) there has been a significant change in law, whether substantive or procedural, applied in the process leading to the person's conviction or sentence;

(B) the change in the law was not reasonably foreseeable by a judge or a competent attorney;

(C) it is appropriate to retroactively apply the change in law because the change requires observance of procedures without which the likelihood of an accurate conviction is seriously diminished; and

(D) the failure to retroactively apply the change in law would result in a fundamental miscarriage of justice, which is established by demonstrating that, had the changed law been in effect at the time of the applicant's trial, a reasonable trier of fact would have a reasonable doubt as to the guilt of the applicant[.]

The State argues that the 1995 amendments were intended to codify the *Teague* rule, and that we are therefore obliged to follow this rule when we decide whether a defendant can pursue a *Blakely* claim after the defendant's conviction is final.

We believe that the State's argument and the legislature's action raise serious questions under the doctrine of separation of powers. One might argue that the legislature has improperly encroached on matters entrusted to the judicial branch of government by attempting to mandate a rule of retroactivity (or, rather, a rule of non-retroactivity) for new interpretations of constitutional law.

We note that in *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the United States Supreme Court declared that all courts, both federal and state, must apply new rules of constitutional law to all defendants whose convictions were not yet final when the new rule was announced.[37]

With regard to the federal courts, the Supreme Court's directive might conceivably be interpreted as an exercise of its supervisory power over the federal judiciary. But the Supreme Court's directive to the states could not be based on its supervisory power. Instead, it appears that the underlying premise of *Griffith* is that the Supreme Court has the authority, as the ultimate interpreter of the federal Constitution, to order state courts to extend this degree of retroactive application to new rules of federal constitutional law.

If, as suggested by *Griffith*, an appellate court's authority to decide the retroactivity of a new constitutional rule stems from the judicial power granted by the constitution, then the legislature would have no authority to enact a statute mandating a different rule of retroactivity.

But we need not resolve this constitutional issue in the present litigation. The defendants in the present appeals are not pursuing their *Blakely* claims in petitions for post-conviction relief under AS 12.72.010 and Criminal Rule 35.1(a). Rather, they filed motions for correction of an illegal sentence under Alaska Criminal Rule 35(a). The legislature did not add any retroactivity limitation to Criminal Rule 35(a). Thus, the defendants' cases are not affected by the 1995 amendments to AS 12.72.010 and Criminal Rule 35.1(a).

For these reasons, we conclude that we must apply the retroactivity test established by the Alaska Supreme Court.

### Part II:

Under the Alaska retroactivity test, should *Blakely* be applied retroactively?

*The two components of Blakely: the requirement that particular issues of fact be resolved by jurors rather than judges, and the requirement that these facts be proved beyond a reasonable doubt*

█ We must now apply the Alaska retroactivity test to resolve the issue of whether *Blakely* should be applied retroactively—that

---

**36.** *See* SLA 1995, ch. 39, §§ 32–39.

**37.** *Griffith*, 479 U.S. at 323–24, 328, 107 S.Ct. at 713–14, 716.

is, whether defendants whose convictions were final before *Blakely* was decided should nevertheless be entitled to obtain relief if they were sentenced in violation of *Blakely*. To answer this question, it is important to distinguish the two separate components of the right to jury trial announced in *Blakely* and its predecessor, *Apprendi v. New Jersey*.[38] These two components are (1) the right to demand that a jury (rather than a judge) decide the disputed issue of fact, and (2) the right to demand that the government prove the disputed issue of fact beyond a reasonable doubt (as opposed to some lesser standard of proof).

On one level, these two requirements are inseparable. As Justice Scalia explained, writing for the Supreme Court in *Sullivan v. Louisiana*, these two procedural protections are interrelated, concomitant aspects of the right to jury trial:

> It is self-evident, we think, that the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated. It would not satisfy the Sixth Amendment to have a jury determine that the defendant is *probably* guilty, and then leave it up to the judge to determine ... whether [the defendant] is guilty beyond a reasonable doubt.... [T]he jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt. [When the jury instructions allow the jury to convict a defendant without finding the defendant guilty beyond a reasonable doubt, the defendant's] Sixth Amendment right to jury trial [is] denied.

*Sullivan,* 508 U.S. 275, 278, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) (emphasis in the original) (footnote omitted).

In other words, a jury trial in which the government is not required to prove its factual assertions beyond a reasonable doubt is not a valid jury trial for purposes of the Sixth and Fourteenth Amendments.

But as we explain in the next section, courts have distinguished the two procedural requirements set forth in *Blakely*. And, between the two, the requirement of proof be-

yond a reasonable doubt plays the more central role in Anglo–American law.

### *The centrality of proof beyond a reasonable doubt*

As evidenced by the United States Supreme Court's decision in *Schriro v. Summerlin,* 542 U.S. 348, 355–58, 124 S.Ct. 2519, 2525–26, 159 L.Ed.2d 442 (2004), reasonable people might debate whether the first of the *Blakely* protections—the right to have a jury, rather than a judge, decide the pertinent issues of fact—should be included among the "procedures that are implicit in the concept of ordered liberty". In *Summerlin,* the Supreme Court declined to give retroactive relief to a defendant who was sentenced to death in violation of *Apprendi* (because a judge, rather than a jury, decided the issues of fact that determined whether the defendant was subject to the death penalty).

The *Summerlin* Court did not reach the issue of proof beyond a reasonable doubt—because, even before *Apprendi* and *Blakely,* Arizona law required that death penalty factors be proved beyond a reasonable doubt. *See Ring v. Arizona,* 536 U.S. 584, 597, 122 S.Ct. 2428, 2437, 153 L.Ed.2d 556 (2002). Thus, the Supreme Court in *Summerlin* had no occasion to consider whether proof beyond a reasonable doubt was "implicit in [our] concept of ordered liberty".

But both the United States Supreme Court and the Alaska Supreme Court have repeatedly emphasized that proof beyond a reasonable doubt is central to our criminal justice system.

In *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970), the Supreme Court held that proof beyond a reasonable doubt was among the fundamental rights guaranteed by the due process clause of the Fourteenth Amendment. Neither the federal government nor any state government has the authority to subject a citizen to criminal penalties based on a lesser standard of proof.

Quoting Justice Frankfurter in *Leland v. Oregon,* the *Winship* Court declared that the

---

**38.** 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

requirement of proof beyond a reasonable doubt was "basic in our law", and that it was both "a requirement and a safeguard of due process of law". *Winship*, 397 U.S. at 362, 90 S.Ct. at 1071.[39] The Court added that this standard of proof is among the "historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions", and that it is "[one of] the fundamental principles that are deemed essential for the protection of life and liberty". *Id.*, 397 U.S. at 362, 90 S.Ct. at 1072.

The *Winship* Court then declared:

The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law.... [A] person accused of a crime would be [deprived] of fundamental fairness ... if he could be adjudged guilty and imprisoned for years on [a lesser standard of proof].

. . .

Moreover, use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.

*Winship*, 397 U.S. at 363–64, 90 S.Ct. at 1072–73 (internal quotation marks omitted).

Two years later, in *Ivan V. v. City of New York*, 407 U.S. 203, 205, 92 S.Ct. 1951, 1952, 32 L.Ed.2d 659 (1972), the Supreme Court held that the due process requirement of proof beyond a reasonable doubt had to be applied wholly retroactively. That is, the Supreme Court held that the states were obliged to grant retroactive relief to all defendants who had been convicted (or adjudicated delinquent) based on a lesser standard of proof—even those defendants whose convictions were final before *Winship* was announced.

In its short, unanimous opinion in *Ivan V.*, the Supreme Court declared that it was obvious that "the major purpose of the constitutional standard of proof beyond a reasonable doubt announced in *Winship* was to overcome an aspect of the criminal trial that [might] substantially impair[ ] [its] truthfinding function"—and that, for this reason, *Winship* must be given complete retroactive effect despite good-faith reliance by state governments on the prior law, and regardless of the impact this retroactive application might have on the administration of justice. *Id.*, 407 U.S. at 204–05, 92 S.Ct. at 1952.

The Alaska Supreme Court, too, has emphasized the fundamental importance of requiring proof beyond a reasonable doubt in criminal cases. The supreme court most recently addressed this issue in *Shaw v. Alaska Department of Administration*, 861 P.2d 566 (Alaska 1993).

In *Shaw*, the supreme court declared that "a primary goal, perhaps the paramount goal, of the criminal justice system is to protect the innocent accused against an erroneous conviction".[40]

Our society has made "a fundamental value determination ... that it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship*, 397 U.S. 358, 372, 90 S.Ct. 1068, 1077, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring); *see also State v. Alto*, 589 P.2d 402, 406 (Alaska 1979) ("[P]lacing the burden of proof on the state beyond a reasonable doubt in criminal cases reflects our belief that it is worse tha[t] an innocent man be jailed than that a guilty man go free.").

*Shaw*, 861 P.2d at 570.

■ As our supreme court explained in *Shaw*, the goal of protecting the innocent

---

**39.** Quoting *Leland*, 343 U.S. 790, 802–03, 72 S.Ct. 1002, 1009, 96 L.Ed. 1302 (1952).

**40.** *Shaw*, 861 P.2d at 570.

from unjust criminal penalties is so important that it overrides society's interest in accurately determining the facts of the case. For this reason, unless those facts can be proved beyond a reasonable doubt, our law requires that the facts remain unproved:

> Few would dispute that reliable factfinding is ... a significant goal of both the criminal and the civil [justice] systems.... In the criminal system, however, the goal of reliable factfinding and the goal of protecting the innocent accused may conflict. [And when] these two goals conflict, ... the goal of reliable factfinding ... must give way to the paramount goal of protecting the innocent accused. As [Professors] LaFave and Israel noted:
>
>> Reliable factfinding, as a goal in itself, would seek to ensure equally the accuracy of both guilty verdicts and nonguilty verdicts. Protection of the innocent, however, places greater priority on the accuracy of the guilty verdict. It reflects a desire to minimize the chance of convicting an innocent person even at the price of increasing the chance that a guilty person may escape conviction.
>
> 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 1.6(c), at 45 (1984).

*Shaw,* 861 P.2d at 570–71.

In other words, our criminal justice system "resolves the conflict between protecting the innocent ... and reliable factfinding by choosing to err on the side of ensuring the accuracy of guilty verdicts." *Shaw,* 861 P.2d at 571. And to ensure the greatest achievable level of accuracy, a defendant in a criminal case must be acquitted unless the government proves the defendant's guilt beyond a reasonable doubt.

This principle is so important to our criminal justice system, so central to our notions of the proper relationship between a society and its citizens, that we insist on proof beyond a reasonable doubt—that is, we insist on achieving the goal of protecting the innocent—even though we know that there will be times when this means sacrificing the goal of determining the truth in a particular case. *Id.*

*Why the Alaska retroactivity test requires retroactive application of Blakely's requirement of proof beyond a reasonable doubt*

As we explained earlier in this opinion, the Alaska Supreme Court has adopted a three-part test for determining whether a new constitutional rule should be applied retroactively. The three criteria are: (1) the purpose to be served by the new rule; (2) the extent of reliance on the old rule; and (3) the effect on the administration of justice of a retroactive application of the new rule.

But in *Rutherford v. State,* 486 P.2d 946 (Alaska 1971), our supreme court declared that the first criterion—the purpose to be served by the new rule—will supersede other considerations whenever "the purpose of the new rule is primarily related to the integrity of the verdict". *Id.* at 952. If that is the case, courts will extend complete retroactivity to the new rule.

Quoting Justice White's plurality opinion in *Williams v. United States,*[41] the supreme court declared:

> Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial which substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule [is to be] given complete retroactive effect. Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice ... suffice[s] to [limit the new rule to] prospective application in these circumstances.

*Rutherford,* 486 P.2d at 952–53.

The "proof beyond a reasonable doubt" component of *Apprendi* and *Blakely* is the type of rule that the Alaska Supreme Court was talking about in *Rutherford:* a rule whose primary purpose is "related to the integrity of the verdict", and whose function is to cure a flaw that "raises serious questions about the accuracy of guilty verdicts". *Rutherford,* 486 P.2d at 952.

41. 401 U.S. 646, 653, 91 S.Ct. 1148, 1152, 28 L.Ed.2d 388 (1971).

It must be remembered that, in this context, the "accuracy" of a verdict refers to something different from the *factual accuracy* of the verdict. As our supreme court explained in *Shaw*, our law's insistence on the principle of proof beyond a reasonable doubt actually entails *sacrificing* the goal of accurate fact-finding in favor of a more important goal: the goal of precluding the government from inflicting criminal penalties on a defendant when there is a reasonable possibility that the defendant did not do the things that would merit those penalties. Thus, an "accurate" verdict in a criminal case is a verdict that preserves this latter goal.

*Blakely* holds that a criminal defendant is entitled to demand proof beyond a reasonable doubt on every issue of fact (other than a prior conviction) that will determine the defendant's maximum punishment under a determinate sentencing law.

As this Court has repeatedly recognized, the pre-March 2005 version of Alaska's presumptive sentencing law violated *Blakely* because, under that former law, disputed issues of fact that would determine a defendant's maximum sentence were proved under the "clear and convincing evidence" standard rather than beyond a reasonable doubt.[42]

This constitutional flaw raises serious questions concerning the "integrity" or "accuracy" of those decisions. Because judges used a "clear and convincing evidence" standard to resolve disputed issues of fact under our pre–2005 presumptive sentencing law, there is a possibility that these issues of fact were resolved incorrectly—"incorrectly" in the sense that defendants received increased terms of imprisonment even though the government did not prove beyond a reasonable doubt that the defendant had done the things that would make the defendant eligible for these increased penalties.

It is true that a *Blakely* violation does not undermine the legal underpinning of the defendant's "conviction" in the narrow sense of that word. That is, a *Blakely* violation does not undermine the integrity or accuracy of the finding that the defendant has committed a crime. Rather, a *Blakely* violation undermines the factual foundation of the sentencing court's authority to impose an increased punishment on the defendant (*i.e.*, a punishment exceeding the applicable presumptive term of imprisonment).

But in Alaska, the retroactive application of new constitutional rules is not limited to rules that affect the finding of guilt at the defendant's trial. In *Thessen v. State*, 508 P.2d 1192, 1195 n. 15 (Alaska 1973),[43] the Alaska Supreme Court held that "the prevention of unconstitutional punishment" is also a compelling reason to apply a new rule of constitutional law retroactively.

The *Blakely* requirement of proof beyond a reasonable doubt is a rule designed to prevent unconstitutional punishment. *Blakely* precludes enhanced punishment when the government has failed to prove, beyond a reasonable doubt, that the defendant has done the things that authorize the sentencing court to impose this enhanced punishment.

Thus, under *Rutherford* and *Thessen*, this Court should grant full retroactivity to the "proof beyond a reasonable doubt" component of the *Blakely* decision even if the other two parts of the Alaska retroactivity test (the extent of reliance on the old rule, and the resulting effect on the administration of justice) would militate against retroactive application.

But we also conclude that *Blakely* merits full retroactive application under the Alaska test even if all three of the test's criteria are considered.

We concede that the second prong of the Alaska test favors the non-retroactivity of *Blakely*. The State of Alaska (as the plaintiff in felony criminal cases) and the Alaska judiciary (in its role of sentencing convicted felony defendants) relied for more than two decades on the presumed constitutionality of the sentencing procedures specified in the pre-March 2005 version of AS 12.55.155—in particular, the procedures for proving the

---

**42.** *See, e.g., State v. Dague,* 143 P.3d 988 (Alaska App.2006); *Moore v. State,* 123 P.3d 1081, 1091 (Alaska App.2005); *Haag v. State,* 117 P.3d 775, 782 (Alaska App.2005).

**43.** Overruled on other grounds in *State v. Dunlop,* 721 P.2d 604 (Alaska 1986).

aggravating factors that increased a defendant's maximum sentence under Alaska's presumptive sentencing law. This fact militates against giving full retroactivity to *Blakely.*

But the third prong of the Alaska test— *i.e.*, the extent of the disruption to the criminal justice system that full retroactivity would entail—again favors retroactivity. We acknowledge that large numbers of felony defendants were sentenced under Alaska's presumptive sentencing law during the twenty-five years between its enactment and its post-*Blakely* amendment in March 2005. However, the majority of those defendants are no longer in custody and have completed their probation and parole. Thus, giving full retroactivity to *Blakely* would not affect the administration of justice in those cases.

(As we recently explained in *Cleveland v. State,* when the Alaska legislature enacted presumptive sentencing, it nevertheless retained indeterminate sentencing for Alaska's most serious felonies.[44] *See* AS 12.55.125(a) and (b). The *Blakely* decision does not affect sentencing for these felonies. *See Carlson v. State,* 128 P.3d 197, 204–05 (Alaska App. 2006). Thus, extending full retroactive application to *Blakely* will not affect the validity of those sentences.)

We estimate that there are a few hundred criminal cases that will potentially be affected if *Blakely* is applied retroactively. We base this estimate on the fact that, according to the Appellate Court Clerks' Office, there are slightly over 250 *Blakely* appeals currently stayed and awaiting our decision of this retroactivity issue.

But based on the *Blakely* cases that this Court has already decided, it appears that only a few of these defendants will be entitled to relief even if *Blakely* is applied retroactively. To date, this Court has decided thirty-five appeals that required us to resolve *Blakely* issues. We have denied relief in thirty-three of these cases.[45] We have granted relief in two of these cases.[46]

Some of these defendants were sentenced for unclassified felonies governed by indeterminate sentencing, so *Blakely* did not apply. Of the cases governed by presumptive sentencing, many of the aggravating factors contested on appeal were based on the defendant's prior convictions, or else they flowed directly from the jury's verdicts. And in most other instances, even when *Blakely* error occurred, the error was harmless beyond a reasonable doubt because there was no reasonable dispute concerning the facts that gave rise to the aggravating factor.

**44.** 143 P.3d 977, 987 (Alaska App.2006).

**45.** In reverse chronological order, these cases are: *State v. Dague,* 143 P.3d 988 (Alaska App. 2006); *Cleveland v. State,* 143 P.3d 977 (Alaska App.2006); *Steward v. State,* Alaska App. Memorandum Opinion No. 5109 (August 23, 2006), 2006 WL 2458574; *State v. Herrmann,* 140 P.3d 895 (Alaska App.2006); *Ohler v. State,* Alaska App. Memorandum Opinion No. 5081 (June 21, 2006), 2006 WL 1720076; *Richards v. State,* Alaska App. Memorandum Opinion No. 5077 (May 31, 2006), 2006 WL 1515606; *Aguchak v. State,* Alaska App. Memorandum Opinion No. 5075 (May 17, 2006), 2006 WL 1360938; *Walsh v. State,* 134 P.3d 366 (Alaska App.2006); *Tyler v. State,* 133 P.3d 686 (Alaska App.2006); *Geisler v. State,* Alaska App. Memorandum Opinion No. 5062 (March 22, 2006), 2005 WL 3883159; *State v. Avery,* 130 P.3d 959 (Alaska App.2006); *Olson v. State,* Alaska App. Memorandum Opinion No. 5038 (February 8, 2006), 2006 WL 306907; *Carlson v. State,* 128 P.3d 197 (Alaska App.2006); *Fox v. State,* Alaska App. Memorandum Opinion No. 5029 (December 21, 2005), 2005 WL 3508661; *Vandergriff v. State,* 125 P.3d 360 (Alaska App.2005); *Snelling v. State,* 123 P.3d

1096 (Alaska App.2005); *Moore v. State,* 123 P.3d 1081 (Alaska App.2005); *Stithem v. State,* Alaska App. Memorandum Opinion No. 5016 (October 26, 2005), 2005 WL 2757786; *State v. Kalmakoff,* 122 P.3d 224 (Alaska App.2005); *Simon v. State,* 121 P.3d 815 (Alaska App.2005); *Greist v. State,* 121 P.3d 811 (Alaska App.2005); *DeRushe v. State,* Alaska App. Memorandum Opinion No. 5011 (October 5, 2005), 2005 WL 2444359; *McDole v. State,* 121 P.3d 166 (Alaska App.2005); *Grossman v. State,* 120 P.3d 1085 (Alaska App. 2005); *Dayton v. State,* 120 P.3d 1073 (Alaska App.2005); *Ned v. State,* 119 P.3d 438 (Alaska App.2005); *Middendorf v. State,* Alaska App. Memorandum Opinion No. 5002 (August 17, 2005), 2005 WL 1971243; *Grohs v. State,* 118 P.3d 1080 (Alaska App.2005); *Edmonds v. State,* 118 P.3d 17 (Alaska App.2005); *Milligrock v. State,* 118 P.3d 11 (Alaska App.2005); *Peltola v. State,* 117 P.3d 771 (Alaska App.2005); *Paige v. State,* 115 P.3d 1244 (Alaska App.2005); *State v. Gibbs,* 105 P.3d 145 (Alaska App.2005).

**46.** *Croughen v. State,* Alaska App. Memorandum Opinion No. 5047 (February 22, 2006), 2006 WL 438749; *Haag v. State,* 117 P.3d 775 (Alaska App.2005).

Moreover, we recently held in *Cleveland v. State* that any single aggravating factor is sufficient to satisfy *Blakely,* and that any remaining aggravating factors could lawfully be proved under the procedures specified in former AS 12.55.155(f)—that is, proved by clear and convincing evidence to the sentencing judge.[47]

Based on our past decisions in *Blakely* cases (that is, the thirty-five *Blakely* claims that we have resolved), it appears that only a small percentage of the pending *Blakely* appeals will present a claim that actually merits relief. Given this relatively small impact on the criminal justice system, and given the crucial purpose served by the *Blakely* rule, we conclude that the *Blakely* requirement of proof beyond a reasonable doubt should be applied retroactively.

Moreover, we would reach this same conclusion even if the number of cases affected by our decision were significantly higher.

Under the pre-March 2005 version of Alaska's presumptive sentencing law, a first felony offender convicted of first-degree sexual assault or first-degree sexual abuse of a minor faced a maximum term of 8 years' imprisonment if the State proved no aggravators, but the sentencing judge could impose up to 40 years' imprisonment if the State proved one or more aggravators.[48] Similarly, first felony offenders convicted of a class A felony faced a maximum term of either 5 or 7 years' imprisonment if the State proved no aggravators, but the sentencing judge could impose up to 20 years' imprisonment if the State proved one or more aggravators.[49]

In other words, under Alaska's former presumptive sentencing law, defendants could be sentenced to prison terms that were substantially longer than the applicable presumptive term—in some instances, three or four or five times longer—based on a single aggravating factor that was proved only by clear and convincing evidence. But the Sixth Amendment, as interpreted in *Apprendi* and *Blakely,* guarantees a criminal defendant the right

to demand proof beyond a reasonable doubt on any issue of fact which, if decided in the government's favor, will subject the defendant to these types of increased sentences.

Because of this, even if several dozen defendants might ultimately be entitled to relief if *Blakely* were applied retroactively, we would still confront the following question: Is it fundamentally fair to allow defendants to serve prison terms that could be three times, four times, or in some cases five times longer than their presumptive term, when this added imprisonment was imposed in violation of the defendants' constitutional right to demand proof beyond a reasonable doubt of the facts that authorized the sentencing judge to impose these longer sentences?

We conclude that this would, indeed, be fundamentally unfair. We therefore hold that, under the Alaska Supreme Court's retroactivity test, the *Blakely* requirement of proof beyond a reasonable doubt must be accorded full retroactivity.

*Why we conclude that, if retroactive application of Blakely requires a new determination of the aggravating factors in a defendant's case, that determination should be made by a jury rather than a judge*

Thus far, our discussion has focused on the component of *Blakely* that requires proof beyond a reasonable doubt. Our conclusion that this component must be applied retroactively raises one more question: If, because of *Blakely* error, one or more aggravating factors in a defendant's case must be relitigated, can this relitigation be performed by the sentencing judge (using a "beyond a reasonable doubt" standard of proof)? Or should the disputed aggravating factors be decided by a jury?

The United States Supreme Court's decision in *Schriro v. Summerlin*[50] suggests that a re-assessment by the sentencing judge might suffice. In *Summerlin,* the Supreme Court rejected the argument that fact-find-

---

**47.** 143 P.3d 977, 987 (Alaska App.2006).

**48.** Former AS 12.55.125(i) (pre-March 2005 version).

**49.** Former AS 12.55.125(c) (pre-March 2005 version).

**50.** 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).

ing by a judge (on the issue of death penalty aggravators) was significantly less accurate than fact-finding by a jury.[51]

It is true that the *Summerlin* Court did not confront the precise issue now facing us: the question of whether a jury trial should be ordered if, because of an error in the standard of proof, the fact-finding in a particular case must be vacated and re-performed anyway. Nevertheless, *Summerlin* suggests that the identity of the fact-finder has significantly less effect on the accuracy of fact-finding than does the standard of proof.

But accuracy of fact-finding is not the only goal of the constitutional guarantee of trial by jury. Indeed, accuracy of fact-finding is not even the primary goal of this guarantee. Both the United States Supreme Court and the Alaska Supreme Court have acknowledged that the guarantee of trial by jury is meant to serve and foster other important societal concerns.

We ourselves explained some of these concerns in *Malloy v. State,* 1 P.3d 1266 (Alaska App.2000),[52] when we discussed the historical importance of the right to trial by jury in American law:

> The development of the common law in England was marked by a tension between the jury, as an expression of the popular will, and the judiciary, as the representative of established authority. Parliament engaged in the practice of barring the right to jury trial when it defined new, statutory offenses such as the Stamp Act and other statutes regulating trade within the British Empire. This practice was condemned by Blackstone, and it occasioned the protest in the American Declaration of Independence against the deprivation of the right to jury trial.

*Malloy,* 1 P.3d at 1283–84.

The United States Supreme Court addressed this same issue in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), when the Court noted that the Americans who drafted our federal constitution understood that the right to jury trial "could be lost not only by gross denial, but by erosion". *Id.,* 526 U.S. at 247–48, 119 S.Ct. at 1226.

> One contributor to the ratification debates ..., commenting on the jury trial guarantee in Art. III, § 2, echoed Blackstone in warning of the need "to guard with the most jealous circumspection against the introduction of new, and arbitrary methods of trial, which, under a variety of plausible pretenses, may in time, imperceptibly undermine this best preservative of LIBERTY."

*Jones,* 526 U.S. at 248, 119 S.Ct. at 1226, quoting *The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* (Neil H. Cogan, editor, 1997), p. 477.

Thus, the guarantee of trial by jury is not based solely or even primarily on the idea that "twelve heads are better than one" when it comes to discerning the truth. Rather, the fundamental concept underlying the constitutional guarantee of jury trial is that juries are "instruments of public justice", in the sense that they are "representative of the community". *Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940).

The Supreme Court elaborated on this concept in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968):

> Those who wrote our constitutions knew from history and experience that it was necessary to protect [citizens] against unfounded criminal charges brought to eliminate enemies[, as well as to protect them] against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary[,] but insisted upon further protection against arbitrary [governmental] action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic

---

**51.** *Id.,* 542 U.S. at 355–58, 124 S.Ct. at 2525–26.

**52.** *Overruled on other grounds* in *State v. Malloy,* 46 P.3d 949 (Alaska 2002).

reaction of the single judge[,] he was to have it.

*Duncan*, 391 U.S. at 156, 88 S.Ct. at 1451.

Or, as Justice Black explained in his dissent in *Green v. United States*, 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672 (1958):

Trial by an impartial jury of independent laymen raises another imposing barrier to oppression by government officers. As one of the more perceptive students of our experiment in freedom keenly observed, "The institution of the jury ... places the real direction of society in the hands of the governed, or of a portion of the governed, and not in that of the government." [Quoting De Tocqueville, *Democracy in America* (Reeve translation, 1948 edition), Vol. 1, p. 282.] The jury injects a democratic element into the law. This element is vital to the effective administration of criminal justice, not only in safeguarding the rights of the accused, but in encouraging popular acceptance of the laws and the necessary general acquiescence in their application.

*Green*, 356 U.S. at 215–16, 78 S.Ct. at 659–660 (Black, J., dissenting).

The Alaska Supreme Court has likewise declared that the jury was intended to be "a body truly representative of the community", in keeping with "our basic, traditional concept of a democratic society and representative government." [53]

One of the Alaska Supreme Court's most detailed discussions of this important role of the jury is found in *Baker v. Fairbanks*, 471 P.2d 386 (Alaska 1970):

[T]he right to jury trial holds a central position in the framework of American justice. Trial by jury is one of the oldest discernible and distinguishing institutions of our Anglo–American system of jurisprudence. Its heritage can be traced in an unbroken line at least from the 14th centu-

ry forward. The Magna Carta declared that "no freeman shall be taken, or imprisoned, or exiled, or in any other manner destroyed, except by the judgment of his peers, or by the law of the land." [As quoted in *Blackstone's Commentaries on the Laws of England* (Cooley, 4th ed. 1899), Vol. 4, p. 343]

*Baker*, 471 P.2d at 396. The supreme court then quoted Blackstone's description of the central importance of trial by jury as a check on the power of the government:

Our law has ... wisely placed this strong ... barrier [of] trial by jury ... between the liberties of the people and the prerogative of the crown. It was necessary ... to vest the executive power of the laws in the prince: and yet this power might be dangerous and destructive ... if exerted [by judges appointed by the crown] without check or control, ... who might then, as in France or Turkey, imprison, dispatch, or exile any man that was obnoxious to the government, by an instant declaration that such is their will and pleasure. But the founders of the English law have, with excellent fore[sight], contrived that ... the truth of every accusation, whether preferred in the shape of indictment [or] information ... should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbors, indifferently chosen and superior to all suspicion.

*Baker*, 471 P.2d at 396–97 (quoting Blackstone's *Commentaries on the Laws of England* (Cooley, 4th ed. 1899), Vol. 4, pp. 349–350).

In short, the *Baker* Court declared, the guarantee of trial by jury is "a valuable safeguard to liberty"—if not "the very palladium of free government". 471 P.2d at 397, quoting Alexander Hamilton, *The Federalist*, No. 83.[54]

---

**53.** *Green v. State*, 462 P.2d 994, 997 (Alaska 1969).

**54.** Hamilton was using the word "palladium" in the sense of "a thing on which the safety of something else depends". The word "palladium" originally referred to any statue of the goddess Pallas Athena. *Webster's New World College Dictionary, Fourth Edition* (2004), p. 1037. The

sense in which Hamilton employed this word derives from the legend that the citadel of Troy would remain unconquered only so long as the statue of its patron goddess, Pallas Athena, was preserved. *Id.*

*See also* http://en.wikipedia.org/wiki/Palladium _(mythology).

The Alaska Supreme Court returned to this theme in *Alvarado v. State*, 486 P.2d 891 (Alaska 1971). In *Alvarado*, our supreme court emphasized that even though the jury is "charged with the task of finding the truth of the facts asserted [in criminal litigation]", this is but one aspect of the jury's role in our system of government:

> The jury is an essential institution in our democracy, and [it] serves multifaceted purposes.... [B]eyond its utility as a finder of fact, the jury fulfills other equally vital political and psychological purposes.... [The jury serves] as a safeguard against the possibility of governmental tyranny and oppression[, as] a protection or barrier against the exercise of arbitrary power[.]

*Alvarado*, 486 P.2d at 903.[55] The supreme court then explained:

> As an institution, the jury offers our citizens the opportunity to participate in the workings of our government, and serves to legitimize our system of justice in the eyes of both the public and the accused.
>
> The jury, like the right to vote, is fundamentally preservative of ideals which are essential to our democratic system. When [this guarantee] is neglected, "[t]he injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts."

*Alvarado*, 486 P.2d at 903–04 (quoting *Ballard v. United States*, 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181 (1946)).

Because the importance of trial by jury far transcends the jury's role as a finder of fact, it could be argued that the United States Supreme Court, when deciding *Schriro v. Summerlin*, should not have focused solely on the comparative accuracy of the findings made by juries versus the findings made by judges. But be that as it may, this Court faces a problem different from the one confronting the Supreme Court in *Summerlin*. We have already concluded that defendants are entitled to retroactive application of the *Blakely* requirement of proof beyond a reasonable doubt—and the issue remaining is whether, in cases where *Blakely* requires a re-assessment of aggravating factors, that re-assessment should be performed by a jury.

Both federal law and Alaska law acknowledge the importance of trial by jury as a guarantee of the citizenry's liberties and as a check on the power of the government (including the power of judges). In addition, in *Baker v. Fairbanks*, our supreme court suggested that the framers of our state constitution intended to adopt a right of jury trial broader than the right recognized at that time under federal law. *Id.*, 471 P.2d at 398–401.

For these reasons, we conclude that if, because of a *Blakely* error, one or more aggravators in a particular case must be relitigated, the defendant is entitled to have a jury decide the disputed aggravators.

### Part III:

### Application of Our Holding to the Two Cases Before Us

■ Appellant Troy S. Smart received an enhanced sentence for second-degree assault based on the State's proof of aggravating factor AS 12.55.155(c)(13)—the allegation that Smart knowingly directed his criminal conduct at an active law enforcement officer during, or because of, the officer's performance of official duties. Smart actively disputed this aggravator in the superior court, but the sentencing judge ruled against him. On appeal, this Court upheld the judge's finding because we concluded that the record was sufficient to support the conclusion that this aggravator had been proved by clear and convincing evidence. *See Smart v. State*, Alaska App. Memorandum Opinion No. 4653 (January 15, 2003), slip opinion at 4–5; 2003 WL 122456 at *2.

Because we hold that *Blakely* must be applied retroactively, we vacate the superior court's finding of aggravator (c)(13), and we direct the superior court to hold renewed proceedings on this aggravator. Smart is entitled to demand that the government

---

**55.** Quoting *Green v. State*, 462 P.2d 994, 997 (Alaska 1969) (quotation marks omitted).

prove this aggravator beyond a reasonable doubt.

■ Appellant Jayme Sobocienski was charged with first-degree sexual assault and second-degree sexual abuse of a minor after he invited a fourteen-year-old girl to his house, gave her liquor, and then had sex with her after she passed out. Sobocienski ultimately agreed to plead guilty to a reduced charge of third-degree sexual assault.

Sobocienski received an enhanced sentence for this offense based on the State's proof of four aggravating factors under AS 12.55.155(c): (c)(10)—that Sobocienski's conduct was among the worst included within the definition of third-degree sexual assault (because his conduct actually constituted a higher degree of sexual assault);[56] (c)(12)—that Sobocienski was on bail release from another felony charge when he committed the sexual assault; (c)(20)—that Sobocienski was on felony probation or parole when he committed the sexual assault; and (c)(18)(B)—that Sobocienski had previously committed a sexual assault on another victim.

Sobocienski conceded the first three of these aggravators. That is, he conceded that his conduct was among the worst included within the definition of third-degree sexual assault, he conceded that he was on bail release from another felony charge, and he conceded that he was probation or parole from a previous felony conviction.

However, Sobocienski contested the State's remaining aggravator—the allegation that he had sexually assaulted another victim. This allegation was not based on a criminal conviction; rather, it was based on sexual assault charges in another case that was dismissed as part of the State's plea bargain with Sobocienski. The sentencing judge ruled that Sobocienski had waived his right to challenge this fourth aggravator because, after the State gave notice of its proposed aggravators, Sobocienski's defense attorney failed to file a responsive pleading as required by Alaska Criminal Rule 32.1(d)(1).

Under *Blakely*, Sobocienski had a right to demand that these aggravators be proved beyond a reasonable doubt. However, the superior court's rulings on these aggravators did not hinge on the difference between proof by "clear and convincing evidence" and proof "beyond a reasonable doubt". None of these four aggravators was litigated. Instead, Sobocienski conceded three of the aggravators, and the superior court ruled that Sobocienski had, by failing to comply with applicable court rules, forfeited his procedural right to contest the fourth aggravator.

■ Moreover, this Court has repeatedly held that a *Blakely* error is subject to harmless error analysis—and that a *Blakely* error is harmless beyond a reasonable doubt if there is no reasonable possibility that a jury would have found in the defendant's favor on the challenged aggravator.[57] The United States Supreme Court recently confirmed that this approach to *Blakely* error is correct: *Washington v. Recuenco*, —— U.S. ——, 126 S.Ct. 2546, 2553, 165 L.Ed.2d 466 (2006).

In Sobocienski's case, there is nothing in the record to suggest—and Sobocienski has never alleged—that there was any doubt concerning aggravator (c)(12) (the fact that Sobocienski was on bail release from another felony charge) or aggravator (c)(20) (the fact that Sobocienski was on probation or parole from a previous felony conviction). Accordingly, any arguable *Blakely* error with respect to these two aggravators is harmless beyond a reasonable doubt.

Under Alaska's pre-March 2005 presumptive sentencing law, the proof of any single aggravator was sufficient to authorize Sobocienski's sentence.[58] Accordingly, we affirm the superior court's decision to deny Sobocienski's motion for correction of sentence under Criminal Rule 35(a).

(The superior court actually denied Sobocienski's motion on a different theory, but we are authorized to affirm the superior court's

---

**56.** See *Benboe v. State*, 698 P.2d 1230, 1232 (Alaska App.1985).

**57.** See, e.g., *Tyler v. State*, 133 P.3d 686, 689 (Alaska App.2006); *Snelling v. State*, 123 P.3d 1096, 1099 (Alaska App.2005); *Milligrock v. State*, 118 P.3d 11, 17 (Alaska App.2005).

**58.** *Cleveland v. State*, 143 P.3d 977, 987 (Alaska App.2006).

decision on any ground revealed by the record.) [59]

*Conclusion*

For the reasons explained here, we hold that the right of jury trial declared in *Blakely v. Washington* must be applied retroactively to all defendants, even those whose convictions were already final when *Blakely* was decided.

With regard to the two present appeals, the decision of the superior court in Sobocienski's case is AFFIRMED, but the decision of the superior court in Smart's case is REVERSED. The superior court's finding of aggravator (c)(13) in Smart's case is VACATED, and Smart's case is remanded to the superior court for renewed proceedings on that aggravator.

STEWART, Judge, concurring.

COATS, Chief Judge, dissenting.

MANNHEIMER, Judge, concurring.

STEWART, Judge, concurring.

I agree with Judge Mannheimer that we apply Alaska law on the question of the retroactivity of *Blakely v. Washington*[1] rather than the analysis in *Teague v. Lane.*[2]

However, I disagree with Judge Mannheimer on whether *Blakely* should be granted retroactive application under *Teague*.

The circuit courts of appeal that have considered the retroactive application of the rule announced in *Blakely* or the corresponding rule governing federal sentences announced in *United States v. Booker*[3] have held that the rule does not apply to cases on collateral review because the rule constitutes a new rule of criminal procedure.[4]

Under the non-retroactivity doctrine from *Teague,* a decision creates a new rule "when it breaks new ground or imposes a new obligation on the States or the Federal Government."[5] When the opinion creates a new rule, the rule applies to previously final judgments only in limited circumstances.[6] For example, new substantive rules which decriminalize a class of conduct or prohibit capital punishment for a class of defendants generally apply retroactively.[7] These new substantive rules apply retroactively because there is a risk that the defendant was convicted for an act that is not criminal or faces a punishment that is not allowed by law.[8] However, new procedural rules generally do not apply retroactively.[9] New procedural rules "merely raise the possibility that someone convicted with the use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of 'watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding.' "[10]

**59.** *See Torrey v. Hamilton,* 872 P.2d 186, 188 (Alaska 1994); *Demoski v. New,* 737 P.2d 780, 786 (Alaska 1987); *Millman v. State,* 841 P.2d 190, 195 (Alaska App.1992); *Russell v. Anchorage,* 626 P.2d 586, 588 n. 4 (Alaska App.1981).

**1.** 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

**2.** 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

**3.** 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

**4.** *See Guzman v. United States,* 404 F.3d 139, 141–44 (2d Cir.2005); *In re Olopade,* 403 F.3d 159, 160–64 (3d Cir.2005); *United States v. Gentry,* 432 F.3d 600, 602–06 (5th Cir.2005); *Simpson v. United States,* 376 F.3d 679, 680–81 (7th Cir.2004); *Schardt v. Payne,* 414 F.3d 1025,

1034–36 (9th Cir.2005); *United States v. Price,* 400 F.3d 844, 845–49 (10th Cir.2005); *In re Dean,* 375 F.3d 1287, 1290 (11th Cir.2004).

**5.** *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070.

**6.** *Schriro v. Summerlin,* 542 U.S. 348, 351–52, 124 S.Ct. 2519, 2522–23, 159 L.Ed.2d 442 (2004).

**7.** *Id.*

**8.** *Id.,* 542 U.S. at 352, 124 S.Ct. at 2522–23.

**9.** *Id.,* 542 U.S. at 352, 124 S.Ct. at 2523.

**10.** *Id.* (quoting *Saffle v. Parks,* 494 U.S. 484, 494–95, 110 S.Ct. 1257, 1264, 108 L.Ed.2d 415 (1990) (some internal quotation marks and citation omitted)).

In *Schriro v. Summerlin*,[11] the United States Supreme Court held that *Ring v. Arizona*[12] did not apply retroactively to a case on collateral review because the rule announced in *Ring* was neither a substantive rule nor a "watershed" rule of criminal procedure.[13] In *Ring*, the Court held that a jury, rather than a judge, had to determine whether an aggravating factor that justified the death penalty was present.[14] Because Arizona law required aggravators to be proved beyond a reasonable doubt, the Court was not required to decide whether the requirement of proof beyond a reasonable doubt amounted to a substantive or watershed procedural rule.[15]

The *Schriro* Court found that the rule announced in *Ring* was procedural rather than substantive because it "altered the range of permissible methods for determining whether a defendant's conduct is punishable by death" rather than "the range of conduct or the class of persons that the law punishes."[16] It further concluded that the rule was not a "watershed" rule of criminal procedure.[17] The Supreme Court found that "[t]he evidence [was] simply too equivocal to support [the] conclusion" that "judicial fact-finding so '*seriously* diminishe[s]' accuracy that there is an 'impermissibly large risk' of punishing conduct the law does not reach."[18] Thus, because it did not fall within either of the two *Teague* exceptions, the Court concluded that the new procedural rule announced in *Ring* did not apply retroactively to cases already final on direct review.[19]

While Judge Mannheimer has a thoughtful argument on why *Blakely* should be retroactive under *Teague* because of the beyond-a-reasonable-doubt standard, it is my judgment that the United States Supreme Court will conclude otherwise. Of course, because the Court has granted certiorari on a case raising the issue of *Blakely's* retroactivity,[20] we may soon have a definitive ruling on the retroactivity of the *Blakely* rule under *Teague*.

COATS, Chief Judge, dissenting.

Almost all courts that have considered the question have held that *Blakely v. Washington*[1] only applies retroactively to cases that were not yet final at the time of the *Blakely* decision. I would follow those decisions in order to avoid undue disruption with minimal benefits.

We are required to apply federal law in determining the retroactivity of the *Blakely* decision. As we pointed out in *Haag v. State*,[2] "[t]he scope of the retroactivity of constitutional decisions of the United States Supreme Court is governed by federal law."[3] Under federal law, "a new rule for conduct of criminal prosecutions [applies] retroactively to all cases, state or federal, pending on direct review or not yet final."[4] The parties

---

11. 542 U.S. 348, 352, 124 S.Ct. 2519, 2523, 159 L.Ed.2d 442 (2004).

12. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

13. *Schriro*, 542 U.S. at 358, 124 S.Ct. at 2526.

14. *Id.*, 542 U.S. at 351, 124 S.Ct. at 2522 (citing *Ring*, 536 U.S. at 603–09, 122 S.Ct. at 2440–43).

15. *See id.*, 542 U.S. at 351 n. 1, 124 S.Ct. at 2522 n. 1.

16. *Id.*, 542 U.S. at 353, 124 S.Ct. at 2523.

17. *Id.*, 542 U.S. at 358, 124 S.Ct. at 2526.

18. *Id.*, 542 U.S. at 355–56, 124 S.Ct. at 2525 (quoting *Teague*, 489 U.S. at 312–13, 109 S.Ct. at 1076–77) (last alteration in original).

19. *Id.*, 542 U.S. at 358, 124 S.Ct. at 2526.

20. *Burton v. Waddington*, 142 Fed.Appx. 297 (9th Cir.2005), 2005 WL 1793351, *cert. granted*, —— U.S. ——, 126 S.Ct. 2352, 165 L.Ed.2d 278 (2006).

1. 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

2. 117 P.3d 775 (Alaska App.2005).

3. *Id.* at 783 (citing *American Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 177, 110 S.Ct. 2323, 2330, 110 L.Ed.2d 148 (1990)). *See also Page v. Palmateer*, 336 Or. 379, 84 P.3d 133, 136–37 (2004) (utilizing *Teague* in reference to *Apprendi's* retroactivity); *State v. Gomez*, 163 S.W.3d 632, 650–51 (Tenn.2005) (holding that application of *Blakely* is dictated by federal law).

4. *Haag*, 117 P.3d at 783 (quoting *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987)).

to this case and most courts that have addressed the retroactivity of the *Blakely* decision agree that, under federal law, *Teague v. Lane*[5] governs the retroactive application of new rules to cases that are final when the new rule is announced.[6] The overwhelming majority of courts have held that *Blakely* should not be applied retroactively to cases that were final at the time of the *Blakely* decision.[7] I would follow this overwhelming precedent.

The Office of Public Advocacy, in an amicus brief, argues that even if we conclude that *Blakely* is not retroactive under federal law, we must separately determine if *Blakely* must be applied retroactively under state retroactivity law. But because *Blakely* is a federal decision, we are required to apply federal law to determine whether *Blakely* is retroactive. In my view, we would only be required to extend *Blakely* further under state law if we adopted the *Blakely* rule under the Alaska Constitution.

In general, the appellate courts of this state will consider adopting a new rule under the state's constitution only if the defendant can advance persuasive reasons for such a decision.[8] Smart and Sobocienski have not advanced such an argument. Although the Alaska Supreme Court has not addressed the issue since the United States Supreme Court decided *Blakely*, in *State v. Malloy*[9] the Alaska Supreme Court considered the *Apprendi v. New Jersey*[10] decision and did not see any inconsistency between the *Apprendi* holding and the pre–2005 presumptive sentencing provisions.[11] Although this is a weak indication of what the Alaska Supreme Court might do, the fact that the Alaska Supreme Court did not see a conflict between *Apprendi* and the former sentencing provisions suggests that the supreme court would not favor adopting *Blakely* under the Alaska Constitution and applying Alaska law on retroactivity.

Alaska's presumptive sentencing structure, as set out in the former sentencing code, was adopted by the Alaska legislature to reduce unjustified disparity in the sentencing of criminal defendants and to make criminal sentencing a more fair and predictable process by limiting the sentencing judge's dis-

**5.** 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

**6.** *Schriro v. Summerlin*, 542 U.S. 348, 351–52, 124 S.Ct. 2519, 2522, 159 L.Ed.2d 442 (2004). The federal appellate courts have universally used *Teague* in determining that *Blakely* is not retroactive. *See In re Zambrano*, 433 F.3d 886, 888 (D.C.Cir.2006); *United States v. Gentry*, 432 F.3d 600, 602–03 (5th Cir.2005); *United States v. Morris*, 429 F.3d 65, 69 (4th Cir.2005); *Schardt v. Payne*, 414 F.3d 1025, 1036 (9th Cir.2005); *Never Misses A Shot v. United States*, 413 F.3d 781, 783 (8th Cir.2005); *Lloyd v. United States*, 407 F.3d 608, 613 (3rd Cir.2005); *Cirilo–Munoz v. United States*, 404 F.3d 527, 532 (1st Cir.2005); *Guzman v. United States*, 404 F.3d 139, 141 (2d Cir.2005); *Varela v. United States*, 400 F.3d 864, 867 (11th Cir.2005); *United States v. Price*, 400 F.3d 844, 846 (10th Cir.2005); *Humphress v. United States*, 398 F.3d 855, 860 (6th Cir.2005); *McReynolds v. United States*, 397 F.3d 479, 481 (7th Cir.2005). Of the state courts that have considered *Blakely*, some have determined that *Teague* controls the retroactivity of this federal constitutional question. *See In re Consiglio*, 128 Cal.App.4th 511, 27 Cal.Rptr.3d 167, 169 (2005); *State v. Houston*, 702 N.W.2d 268, 270 (Minn. 2005). Some state courts have utilized *Teague* because their state has adopted *Teague* as its own retroactivity test. *See State v. Febles*, 210 Ariz. 589, 115 P.3d 629, 632 (Ct.App.2005); *State v.*

*Wenzinger*, —— P.3d ——, ——, 2006 WL 1493802 at *4 (Colo.Ct.App.2006). And other state courts have used *Teague* as the federal retroactivity test, while reserving the right to use their own state retroactivity principles to treat *Blakely* as a question of state law. *See State v. Evans*, 154 Wash.2d 438, 114 P.3d 627, 633 (2005).

**7.** *See Zambrano*, 433 F.3d at 889; *Gentry*, 432 F.3d at 605; *Morris*, 429 F.3d at 69; *Payne*, 414 F.3d at 1036; *Never Misses A Shot*, 413 F.3d at 783; *Lloyd*, 407 F.3d at 613; *Cirilo–Munoz*, 404 F.3d at 533; *Guzman*, 404 F.3d at 141; *Varela*, 400 F.3d at 867; *Price*, 400 F.3d at 846; *Humphress*, 398 F.3d at 860; *McReynolds*, 397 F.3d at 481; *Houston*, 702 N.W.2d at 273–74; *Consiglio*, 27 Cal.Rptr.3d at 170; *Evans*, 114 P.3d at 633; *Langford v. State*, 929 So.2d 598, 600 (Fla.Dist. Ct.App.2006); *Smith v. State*, 922 So.2d 43, 46 (Miss.Ct.App.2006).

**8.** *See State v. Coon*, 974 P.2d 386, 394 (Alaska 1999).

**9.** 46 P.3d 949 (Alaska 2002).

**10.** 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**11.** *Malloy*, 46 P.3d at 957.

cretion.[12] The former code did not apply presumptive sentencing to first-felony offenders convicted of class B and C felony offenses.[13] First offenders convicted of class A felony offenses faced presumptive terms.[14] The legislature required presumptive sentences for most repeat felony offenders.[15] (Presumptive sentencing did not apply to murder and kidnaping offenses.)[16] Once a defendant faced a presumptive sentence, a sentencing judge could deviate from the presumptive sentence only by finding one of many enumerated aggravating or mitigating factors or by referring the case to a three-judge panel.[17]

In *Austin v. State,*[18] we attempted to carry out the legislature's express goal of having more uniformity in sentencing by extending the logic of presumptive sentencing to a first-felony offender convicted of a class C felony. Because Austin was a first-felony offender, to whom presumptive sentencing did not apply, the sentencing judge was legally authorized to sentence him up to the 5–year maximum sentence without finding any aggravating factors. In *Austin,* we concluded that, since a second felony offender would face a presumptive sentence of 2 years of imprisonment, it would be illogical for the sentencing judge to sentence a first-felony offender to more than the presumptive term for a second-felony offender unless the sentencing judge found that the case was exceptional.[19]

In *State v. Jackson,*[20] we used a similar analysis in setting out sentencing guidelines for first-felony offenders convicted of class B felonies. Again, the former code did not apply presumptive sentencing to first-felony offenders who were convicted of class B felonies. But we set out sentencing guidelines based upon the logic of presumptive sentencing and our decision in *Austin.*[21] The purpose of the *Austin* and *Jackson* decisions was to carry out the legislative goal of making sentencing more logical, uniform, and fair by limiting and directing the judge's sentencing discretion.

In *Apprendi,* the United States Supreme Court, by a five to four vote, held that "any [disputed] fact (other than a prior conviction) that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[22] In *Blakely,* the Court clarified that judges' discretion in sentencing reaches only the maximum sentence that can be proved solely on facts reflected in the jury verdict or admitted by the defendant.[23] Under our former sentencing code the sentencing judge was not authorized to exceed an applicable presumptive term of imprisonment unless the State proved aggravating factors.[24] The former sentencing code required that aggravating factors be proved to the sentencing judge by clear and convincing evidence.[25] This sentencing scheme violated *Blakely* because *Blakely* required any fact (other than a prior conviction) that raised the maximum sentence that the defendant faced to be proved to a jury beyond a reasonable doubt.[26]

The majority concludes that the primary reason to apply *Blakely* retroactively is because the defendant was deprived of his right to have the State prove an aggravator beyond a reasonable doubt. But it is unlikely that there are many cases where a judge

**12.** *See Juneby v. State,* 641 P.2d 823, 829–33 (Alaska App.1982), *modified and superseded on other grounds,* 665 P.2d 30 (Alaska App.1983).

**13.** *Id.* at 830; former AS 12.55.125(d) and (e) (pre-March 2005 version).

**14.** Former AS 12.55.125(c).

**15.** *Juneby,* 641 P.2d at 830.

**16.** Former AS 12.55.125(a).

**17.** *Juneby,* 641 P.2d at 831.

**18.** 627 P.2d 657 (Alaska App.1981).

**19.** *Id.* at 658.

**20.** 776 P.2d 320 (Alaska App.1989).

**21.** *Id.* at 326–27.

**22.** 530 U.S. at 490, 120 S.Ct. at 2362–63.

**23.** 542 U.S. at 303, 124 S.Ct. at 2537.

**24.** Former AS 12.55.155(a) and (f).

**25.** Former AS 12.55.155(f).

**26.** *Haag,* 117 P.3d at 782.

would have found an aggravator by clear and convincing evidence but would not have found it under the standard of beyond a reasonable doubt. And, under our decision in *Cleveland v. State*,[27] the judge would only have to find one aggravator beyond a reasonable doubt to comply with *Blakely*. After that, the judge could find all other aggravators by clear and convincing evidence.[28]

There are many aggravating factors, and some are almost always present for some offenses. For instance, in almost every case of manslaughter a defendant will have "employed a dangerous instrument in furtherance of the offense."[29] This aggravator will almost always be present, and, if found beyond a reasonable doubt, will satisfy *Blakely*. Similarly, a defendant who commits a forcible sexual assault will almost always cause physical injury to his victim, another aggravating factor.[30] So this aggravator will be present in almost every case and the case will comply with *Blakely*.

In our former sentencing decisions, we pointed out that when an aggravator is almost always present in an offense, it should only be used to increase the defendant's sentence in unusual cases.[31] But after *Blakely*, these aggravating factors that are almost always present for a particular offense will satisfy *Blakely* and will allow the court to find other aggravating factors by clear and convincing evidence.

When we apply *Blakely* retroactively, the result is that in some cases, such as manslaughter and forcible sexual assault, *Blakely* will be satisfied in almost every case. In other cases the State will have to prove an aggravator long after the offense. Defendants who conceded aggravating factors at their original sentencing can claim that they would not have conceded had they known they were entitled to a jury trial. In those cases where the aggravating factors must now be proved to a jury, the State will face some difficult decisions about whether it is

worth reopening those cases, assuming that the evidence and witnesses are still available.

The State has made charging decisions and courts have imposed sentences based upon the sentencing laws that were in effect at the time the sentence was imposed. These decisions might have been very different if the *Blakely* decision had been foreseeable. Sentencing aggravators that the State might have been able to prove easily at the time of the defendant's original sentencing might now be difficult or impossible to prove in a jury trial conducted years later. The State might be in a position of having to call crime victims, long after the event, to testify about an incident that the victims have put behind them. By making *Blakely* retroactive, we are not advancing an important constitutional principle. We are creating a major administrative problem. Whether a person gets his sentence reduced may turn more on good fortune than anything else. It seems to me that the overwhelming majority of courts that have declined to extend *Blakely* retroactively have concluded that retroactively changing the law that applies to sentencing would be unfair and unduly disruptive. I would follow this overwhelming majority.

MANNHEIMER, Judge, concurring.

I write separately to address two issues that our supreme court may confront in the event that one or more of the parties petition that court to review our decision. The first issue is whether Alaska should adopt the *Teague* retroactivity test as a matter of state law. The second issue is whether, under the *Teague* test, the right of jury trial announced in *Blakely* should be given retroactive application.

*Should Alaska adopt the retroactivity test of Teague v. Lane?*

Although the parties to the present appeals may be primarily interested in Part II of our decision (our resolution of the question

---

27. 143 P.3d 977 (Alaska App.2006).

28. *Id.* at 987.

29. *See* AS 12.44.155(c)(4); *Krasovich v. State*, 731 P.2d 598, 601 (Alaska App.1987).

30. *See* AS 12.55.155(c)(1); *Woods v. State*, 667 P.2d 184, 187–88 (Alaska 1983).

31. *Krasovich*, 731 P.2d at 603; *Woods*, 667 P.2d at 187–88.

of whether the *Blakely* right of jury trial will be applied retroactively), it is the question addressed in Part I—that is, the question of what law governs an appellate court's decision as to whether a new constitutional rule will be applied retroactively—that has a more lasting importance to our law and to the people of this state.

Within twenty to twenty-five years, essentially all of the defendants who received presumptive sentences under the pre-March 2005 version of our presumptive sentencing law will have served their sentences, and the issue of *Blakely's* retroactivity will then be of interest only to legal scholars. (Remember that Alaska retained indeterminate sentencing for the most serious felonies; the *Blakely* decision does not affect those longer sentences.) But with regard to the larger question of what law governs the retroactivity of new constitutional rules, the answer will affect the citizens of this state for the indefinite future, in many different contexts.

As explained in the majority opinion, the retroactivity test adopted by the United States Supreme Court in *Teague v. Lane*[1] was not intended to bind the states. Rather, the *Teague* test was intended to limit the authority of the federal courts when state defendants seek to overturn their convictions in federal habeas corpus litigation.

Under *Teague,* if a state prisoner initiates federal habeas corpus litigation and attacks their conviction on the basis of a new rule of federal constitutional law, the federal courts must, in most instances, decline to reach the merits of the prisoner's claim (assuming that the state raises the *Teague* defense in a timely fashion). But *Teague* does not prohibit state courts from extending full or partial retroactivity to a new federal constitutional rule.

As the South Dakota Supreme Court explained in *Cowell v. Leapley,* 458 N.W.2d 514 (S.D.1990):

> The *Teague* decision [defines the right of] habeas corpus ... granted [under] federal statutes.... [But] various states, including South Dakota, have created state rights of habeas corpus through [their own] statutes.... Each sovereign has the right to decide how it will allow access to this extraordinary remedy. The federal government controls how it permits access to the remedy in its courts, and South Dakota [decides how it] will provide access to habeas corpus in our courts.... [A] federal decision on what criteria [govern] retroactive application of constitutional law in a federal habeas corpus proceeding [is not] controlling on a retroactivity question in a state habeas corpus proceeding.

*Cowell,* 458 N.W.2d at 517.

Nevertheless, several state supreme courts have concluded that they should adopt the *Teague* test as a matter of state law. Of course, one can not say that these courts were wrong, as a legal matter, to declare that the *Teague* retroactivity test was an accurate reflection of their state's law on this subject. But I believe that these courts were wrong, as a matter of policy, to adopt the *Teague* test.

The *Teague* retroactivity test was designed to be narrow—designed so that very few constitutional rulings will be applied retroactively. (To date, none has.) Justice O'Connor declared that the narrowness of the *Teague* test was based on two considerations: federal-state comity, and the societal interest in the finality of criminal judgements.[2]

"Federal-state comity" is a polite way of referring to the goal of avoiding the political difficulties that can be created when the federal government exercises authority over matters that might reasonably be viewed as being primarily state concerns. This goal has no bearing on the question of whether a state supreme court should grant or withhold retroactive application of new constitutional rules to defendants who were prosecuted and convicted under that state's law.

Society's interest in the finality of criminal judgements is, however, just as strong in state post-conviction litigation as it is in federal post-conviction litigation. To echo what Justice O'Connor said in *Teague:* judges,

---

1.   489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

2.   *Teague,* 489 U.S. at 308, 109 S.Ct. at 1074.

prosecutors, and police officers "are understandably frustrated when they faithfully apply existing constitutional law only to have [an appellate] court discover ... new constitutional commands" in a later proceeding for post-conviction relief.[3].

Moreover, as this Court noted in *Grinols v. State:*

Society [as a whole] has a substantial interest in making sure that criminal litigation eventually reaches an end. All persons involved in the litigation—defendants, victims, families and friends, investigative agencies, as well as the public at large—have a right to expect that criminal cases will be finally resolved at some point. If prisoners are allowed to assert claims long after their trials, society runs the risk that re-trials may be ordered years after the event, when witnesses may no longer be available or their memories of the pertinent occurrences have been lost or diminished. In addition, piecemeal litigation of successive and often fruitless post-conviction claims poses a significant cost to the courts and the other components of the criminal justice system. As our supreme court recognized in *Merrill v. State,*

finality may be a crucial element [in the] effectiveness [of the criminal law]. A procedural system which permits an endless repetition of inquiry into facts and law in a vain search for ultimate certitude implies a lack of confidence about the possibilities of [administering] justice that cannot but war with the effectiveness of the [law's] underlying substantive commands. Furthermore, ... an endless reopening of convictions, with its continuing underlying implication that perhaps the defendant can escape from corrective sanctions after all, [is potentially inconsistent] with the aim of rehabilitating offenders.

*Grinols,* 10 P.3d 600, 605–06 (Alaska App. 2000).[4]

The *Teague* test is doubtless an effective way of preserving the finality of criminal judgements—because, under the *Teague* test,

hardly any constitutional ruling will qualify for retroactive application. But because the *Teague* test is so narrow—that is, because the federal courts will rarely, if ever, provide relief to a state prisoner who was convicted or sentenced under procedures that violate a later-announced rule of federal constitutional law—it is all the more important for state courts to weigh considerations of fairness as well as considerations of finality when deciding whether a new rule should be applied retroactively.

As the Tennessee Supreme Court said when it rejected the *Teague* test, a state court should attempt "to dispense justice in a manner more befitting state concerns, history, and jurisprudence". *Meadows v. State,* 849 S.W.2d 748, 754 (Tenn.1993). In other words, a state court should have the flexibility to apply new rules retroactively in situations where a retroactive application will best achieve justice—even when, because of principles of federal-state comity, the federal courts should abstain from the litigation.

Many of the courts that have adopted *Teague* as a matter of state law have missed this crucial point. These courts explain their decisions by asserting that there should not be two different tests for retroactivity, depending on whether a prisoner is litigating in federal court or state court. See, for example, the words of the Arizona Supreme Court in *State v. Slemmer:*

[D]iversity [in the rules governing retroactivity] would be mischievous and a disservice to principles of federalism. The law regarding retroactivity is complex enough without requiring counsel and trial judges to apply different retroactivity rules, depending on whether the substantive decision is grounded on state or federal constitutional principles—especially when many decisions are grounded on both.

170 Ariz. 174, 823 P.2d 41, 49 (1991).

But this is wrong: there *should* be different tests for retroactivity.

The *Teague* test is very restrictive because it is based, in large measure, on a policy that

---

**3.** *Id.,* 489 U.S. at 310, 109 S.Ct. at 1075.

**4.** Quoting *Merrill v. State,* 457 P.2d 231, 236 (Alaska 1969).

federal courts should be loathe to disrupt the finality of state court judgements. State courts, on the other hand, should have greater authority to re-examine their own state's judgements. They should not hamstring themselves by adopting a test that precludes retroactive relief in all but the most exceptional cases. Rather, as the Missouri Supreme Court said, state courts should employ a test that "permits [them] to consider the particular facts and legal issues relevant to the specific issue before [them]". *State v. Whitfield,* 107 S.W.3d 253, 267 (Mo.2003).

Moreover, because the federal courts are bound by *Teague,* state courts have effectively become the courts of last resort on the issue of whether new rules of federal constitutional law should be applied retroactively. State courts must therefore be free to do justice in situations where a new rule should, in fairness, be applied retroactively, and where this can be done without significant disruption of the criminal justice system.

I note that the Alaska Supreme Court has, on several occasions, extended either full or partial retroactive application to new rules of constitutional law in situations where the new rule would arguably (or even clearly) fail the *Teague* test. See *State v. Semancik,* 99 P.3d 538, 543 (Alaska 2004), *Briggs v. Department of Public Safety,* 732 P.2d 1078, 1080 n. 4 (Alaska 1987), *Thessen v. State,* 508 P.2d 1192, 1195 n. 15 (Alaska 1973),[5] and *Rutherford v. State,* 486 P.2d 946, 952–55 (Alaska 1971). See also *Koch v. State,* 653 P.2d 664, 667 (Alaska App.1982), where this Court did the same.

If the Alaska Supreme Court were to adopt the *Teague* test as state law on the issue of retroactivity, the supreme court (and this Court) would be barred from ever again issuing such decisions. I believe that this would be contrary to the best interests of the law and the people of Alaska.

*Should the "proof beyond a reasonable doubt" component of Blakely be applied retroactively under the Teague test?*

Both Judge Coats (in his dissent) and Judge Stewart (in his concurrence) conclude

that, if we were applying the *Teague* retroactivity test, the *Blakely* right of jury trial would fail to qualify for retroactive application. I reach the opposite conclusion.

As explained in this Court's main opinion, the right of jury trial announced in *Blakely v. Washington* has two components: (1) the right to demand that a jury (rather than a judge) decide the disputed issue of fact, and (2) the right to demand that the government prove the disputed issue of fact beyond a reasonable doubt (as opposed to some lesser standard of proof).

The United States Supreme Court has already rejected the contention that *Blakely's* first component qualifies for retroactive application under the *Teague* test: *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).

The defendant in *Summerlin* was sentenced to death in violation of *Apprendi*— because a judge (rather than a jury) decided the issues of fact that determined whether he was subject to the death penalty. When Summerlin sought federal habeas corpus relief, the Supreme Court held that the identity of the fact-finder was not so crucial an element of the proceedings as to qualify for retroactivity under *Teague,* because there was no proof that findings of fact made by a jury are any more accurate than findings made by a judge. *Id.,* 542 U.S. at 355–58, 124 S.Ct. at 2525–26.

On this narrow issue, the Supreme Court may well have been right. But, as explained in our majority opinion, the Supreme Court has repeatedly emphasized that the importance of the right to jury trial transcends whatever skills the jurors may bring to the fact-finding process. The jury is an institution that serves as a check on the executive and judicial authority of the government, and that preserves the participation and ultimate control of the community in matters of criminal justice. As Justice Scalia (the author of *Summerlin*) himself noted in *Blakely,* the right to jury trial

> is no mere procedural formality, but a fundamental reservation of power in our constitutional structure.... [The Constitu-

---

**5.** Overruled on other grounds in *State v. Dunlop,*

721 P.2d 604 (Alaska 1986).

tion's guarantee of] jury trial is meant to ensure [the people's ultimate] control in the judiciary. . . . *Apprendi* carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended.

*Blakely*, 542 U.S. at 305–06, 124 S.Ct. at 2538–39 (citations omitted).

Moreover, the *Summerlin* Court did not consider whether the second *Blakely* component—the requirement of proof beyond a reasonable doubt—qualified for retroactive application under the *Teague* test. Arizona law required that death penalty factors be proved beyond a reasonable doubt. *See Ring v. Arizona,* 536 U.S. 584, 597, 122 S.Ct. 2428, 2437, 153 L.Ed.2d 556 (2002). Thus, the Supreme Court in *Summerlin* had no occasion to consider whether the requirement of proof beyond a reasonable doubt was "implicit in [our] concept of ordered liberty" [6] —whether it was a procedure so "fundamental [to the] fairness of [a] trial" [7] that, without it, "the likelihood of an accurate conviction is seriously diminished".[8]

Just a few months ago, the Supreme Court granted certiorari on the issue of whether, because of the guarantee of proof beyond a reasonable doubt, *Blakely* meets the *Teague* test for retroactive application in federal habeas corpus litigation. *See Burton v. Waddington,* —— U.S. ——, 126 S.Ct. 2352, 165 L.Ed.2d 278 (2006). (The petitioner, Burton, was sentenced under the same Washington determinate sentencing scheme that was at issue in *Blakely.*) Thus, we can expect the Supreme Court to resolve this legal issue by next summer.

In the meantime, however, my colleagues and I have done the best we could to discern the answer from existing law. Here is my analysis:

(a) *Why I conclude that the right of jury trial recognized in Blakely is a "new"*

rule and a *"procedural" rule for purposes of Teague*

Under the test for retroactivity announced in *Teague v. Lane,* if a court decision announces a "new" constitutional rule, and if this rule is "procedural" rather than "substantive", the new rule generally will not be applied to defendants whose convictions became final before the rule was announced. *Teague* recognizes only two exceptions to this rule of non-retroactivity: (1) when the new constitutional rule restricts the authority of the government to criminalize "certain kinds of primary, private individual conduct", and (2) when the new constitutional rule "requires the observance of . . . procedures that are implicit in the concept of ordered liberty". *Teague,* 489 U.S. at 307, 109 S.Ct. at 1073.

(Actually, as the Supreme Court later acknowledged in *Schriro v. Summerlin,* new rules that fall within the first *Teague* exception "are more accurately characterized as substantive rules [that are] not subject to [*Teague's* ] bar".) [9]

I conclude that *Blakely* created a "new" rule for purposes of the *Teague* test. As Justice O'Connor wrote in her concurring opinion in *Wright v. West,* "To determine what counts as a new rule, *Teague* requires courts to ask whether the rule . . . can be meaningfully distinguished from [the rules] established by *binding precedent* at the time [the defendant's] state court conviction became final." (Emphasis added) [10]

Even though a newly announced rule may be described as "controlled" or "governed" by prior judicial decisions, this does not necessarily decide the issue of whether the rule is "new" for purposes of *Teague.* As the Supreme Court explained in *Butler v. McKellar,*

[T]he fact that a court says that its decision is within the "logical compass" of

---

6. *Teague,* 489 U.S. at 307, 109 S.Ct. at 1073.

7. *Id.,* 489 U.S. at 312, 109 S.Ct. at 1076.

8. *Id.,* 489 U.S. at 313, 109 S.Ct. at 1077.

9. *Schriro v. Summerlin,* 542 U.S. 348, 352 & n. 4, 124 S.Ct. 2519, 2522 & n. 4, 159 L.Ed.2d 442 (2004).

10. *Wright v. West,* 505 U.S. 277, 304, 112 S.Ct. 2482, 2497, 120 L.Ed.2d 225 (1992) (O'Connor, J., concurring).

an earlier decision, or indeed that it is "controlled" by a prior decision, is not conclusive for purposes of deciding whether the current decision is a "new rule" under *Teague.* Courts frequently view their decisions as being "controlled" or "governed" by prior opinions even when [they are] aware of reasonable contrary conclusions reached by other courts.... [If] the outcome ... [was] susceptible [of] debate among reasonable minds ..., [the rule should be viewed as] a "new rule."

494 U.S. 407, 415, 110 S.Ct. 1212, 1217–18, 108 L.Ed.2d 347 (1990).

The decision in *Blakely* was clearly susceptible of reasonable debate, even after the Supreme Court's decision in *Apprendi.* In the four years between *Apprendi* and *Blakely,* many federal and state courts considered the issue of whether, in light of *Apprendi,* determinate sentencing schemes that hinged on judge-tried sentencing factors violated a defendant's right to trial by jury under the Sixth Amendment. Without exception, these federal and state courts upheld the determinate sentencing schemes against the Sixth Amendment challenge.

This fact essentially decides the question of whether *Blakely* announced a new rule. To paraphrase what the Supreme Court said on this subject in *Beard v. Banks,* even though the Sixth Amendment principle announced in *Apprendi* "could be thought to support" the decision in *Blakely,* "reasonable jurists differed [on] this point", and "reasonable jurists could have concluded that the [decision in *Apprendi* ] did not compel [the decision in *Blakely* ]".[11] Accordingly, *Blakely* announced a "new" rule for purposes of *Teague.*

Additionally, I conclude that the *Blakely* rule is "procedural" rather than "substantive" for purposes of *Teague.*

As the Supreme Court explained in *Schriro v. Summerlin,* a rule is "substantive" rather than "procedural" for *Teague* purposes "if it alters the range of conduct or the class of persons that the law punishes". 542 U.S. at 353, 124 S.Ct. at 2523. "In contrast,

rules that regulate only the manner of determining the defendant's culpability are procedural." *Id.*

In *Summerlin,* the Supreme Court held that the rule announced in *Ring v. Arizona*— the rule that the Sixth Amendment is violated when a sentencing judge, sitting without a jury, finds an aggravating circumstance that authorizes the imposition of the death penalty[12]—was a procedural rule for purposes of *Teague.*

> [The] holding [in *Ring* ] did not alter the range of conduct Arizona law subjected to the death penalty. [*Ring* ] rested entirely on the Sixth Amendment's jury-trial guarantee, a provision that has nothing to do with the range of conduct a State may criminalize. Instead, *Ring* altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment. Rules that allocate decision[-]making authority in this fashion are prototypical procedural rules, a conclusion we have reached in numerous other contexts.

*Summerlin,* 542 U.S. at 353, 124 S.Ct. at 2523 (citations omitted).

The Supreme Court then rejected Summerlin's contention that since, under *Ring,* the death penalty sentencing factors had to be proved to a jury beyond a reasonable doubt, *Ring* effectively altered the definition of murder by declaring that these sentencing factors were "elements" of the crime—thus making *Ring* a "substantive" decision for purposes of the *Teague* retroactivity test. The Court explained that the expansion of the right to jury trial did not alter the elements of the underlying offense:

> A decision that modifies the elements of an offense is normally substantive rather than procedural. New elements alter the range of conduct the statute punishes, rendering some formerly unlawful conduct lawful or vice versa. [Citation omitted] But that is not what *Ring* did; the range of conduct punished by death in Arizona

---

**11.** *Beard v. Banks,* 542 U.S. 406, 416, 124 S.Ct. 2504, 2513, 159 L.Ed.2d 494 (2004).

**12.** *Ring v. Arizona,* 536 U.S. 584, 609, 122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002).

was the same before *Ring* as after. *Ring* held that, because Arizona's statutory aggravators restricted (as a matter of state law) the class of death-eligible defendants, those aggravators *effectively were* elements for federal constitutional purposes, and so were subject to the procedural requirements the Constitution attaches to trial of elements. 536 U.S., at 609, 122 S.Ct. 2428. This Court's holding that, *because* Arizona has made a certain fact essential to the death penalty, that fact must be found by a jury, is not the same as *this Court's* making a certain fact essential to the death penalty. The former was a procedural holding; the latter would be substantive.

*Summerlin*, 542 U.S. at 354, 124 S.Ct. at 2524 (emphasis in the original).

(This Court, too, recently rejected the contention that all facts which must be proved to a jury under *Blakely* must also be deemed elements of the underlying crime. *See State v. Dague*, 143 P.3d 988 (Alaska App.2006).)

Based on the Supreme Court's resolution of this issue in *Summerlin* (a decision that was handed down on the same day as *Blakely* ), I conclude that *Blakely*—like *Ring*—established a "procedural" rule.

*(b) Although Blakely established a new procedural rule, the Blakely guarantee of proof beyond a reasonable doubt qualifies for retroactive application under the Teague test*

For the reasons explained in the preceding section, I conclude that *Blakely* established a new procedural rule for purposes of the *Teague* test. This being so, *Teague* declares that *Blakely* should not be applied to defendants whose convictions became final before *Blakely* was announced, unless the *Blakely* rule falls within one of *Teague's* two exceptions.

Only one of those exceptions potentially applies here: the exception for rules that "require[ ] the observance of . . . procedures that are implicit in the concept of ordered

liberty"[13]—rules which "improve the pre-existing fact-finding procedures" to such an extent that their absence "implicate[s] the fundamental fairness of [a] trial"[14] by seriously diminishing "the likelihood of an accurate conviction".[15] The question, then, is whether *Blakely's* guarantee of proof beyond a reasonable doubt is such a rule.

Essentially every court, whether state or federal, that has considered the issue of whether *Teague* allows the retroactive application of *Apprendi* and *Blakely* has concluded that the answer is "no".

However, this apparently unanimous authority is not as convincing as it might appear. The court decisions holding that *Apprendi* and/or *Blakely* are not retroactive under the *Teague* test fall into three groups—and only one of these groups actually addresses the issue of whether *Apprendi* and/or *Blakely* should be applied retroactively because of the guarantee of proof beyond a reasonable doubt.

The first group comprises decisions from jurisdictions like Arizona—jurisdictions that did not have to deal with the "proof beyond a reasonable doubt" aspect of *Apprendi* and *Blakely* because governing state law already required that aggravating factors be proved beyond a reasonable doubt.

The second group comprises decisions that simply do not address the "proof beyond a reasonable doubt" aspect of the problem. Some of these courts omitted any discussion of this issue. Other courts noted the "proof beyond a reasonable doubt" component of *Apprendi* or *Blakely*, but then inexplicably failed to address this component in their *Teague* analysis. *See, e.g., United States v. Gentry*, 432 F.3d 600, 605 (5th Cir.2005); *Never Misses A Shot v. United States*, 413 F.3d 781, 783–84 (8th Cir.2005); *United States v. Mora*, 293 F.3d 1213, 1219 (10th Cir.2002); *People v. Wenzinger*, —— P.3d ——, —— (Colo.App.2006), 2006 WL 1493802 at *6–*7.

---

**13.** *Teague*, 489 U.S. at 307, 109 S.Ct. at 1073.

**14.** *Id.*, 489 U.S. at 312, 109 S.Ct. at 1076.

**15.** *Id.*, 489 U.S. at 330, 109 S.Ct. at 1086 (Brennan, J., dissenting).

What remains is a smaller group of cases that address the issue of "proof beyond a reasonable doubt" and expressly conclude that the *Apprendi* and *Blakely* guarantee of proof beyond a reasonable doubt is not a fundamental component of our criminal justice system.

On the face of it, this conclusion is shocking. The United States Supreme Court has repeatedly emphasized the central role of proof beyond a reasonable doubt in our society's system of criminal justice.

In *In re Winship*, 397 U.S. 358, 362–64, 90 S.Ct. 1068, 1071–73, 25 L.Ed.2d 368 (1970), the Supreme Court held that proof beyond a reasonable doubt was among the fundamental rights guaranteed by the due process clause of the Fourteenth Amendment. In other words, neither the federal government nor any state government has the authority to subject a citizen to criminal penalties based on a lesser standard of proof.

The *Winship* Court declared that the requirement of proof beyond a reasonable doubt is "basic in our law",[16] that it is both "a requirement and a safeguard of due process of law",[17] and that it is "[one of] the fundamental principles that are deemed essential for the protection of life and liberty".[18] The *Winship* Court also declared that

> use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.

*In re Winship*, 397 U.S. at 364, 90 S.Ct. at 1072–73.

*See also Sullivan v. Louisiana*, 508 U.S. 275, 278, 113 S.Ct. 2078, 2081, 124 L.Ed.2d

182 (1993) (holding that the Sixth Amendment right to jury trial is violated when, even though a jury decides the defendant's case, the jury is allowed to base its decision on less than proof beyond a reasonable doubt).

Two years after its decision in *Winship*, the Supreme Court held that the due process requirement of proof beyond a reasonable doubt should be applied wholly retroactively—that is, even to defendants whose convictions were final before *Winship* was announced. *Ivan V. v. City of New York*, 407 U.S. 203, 204–05, 92 S.Ct. 1951, 1952, 32 L.Ed.2d 659 (1972).

In *Ivan V.*, the Supreme Court declared that it was obvious that "the major purpose of the constitutional standard of proof beyond a reasonable doubt announced in *Winship* was to overcome an aspect of the criminal trial that [might] substantially impair[ ] [its] truth-finding function"—and that, for this reason, *Winship* must be given complete retroactive effect despite good-faith reliance by state governments on the prior law, and regardless of the impact this retroactive application might have on the administration of justice. *Id.*, 407 U.S. at 204–05, 92 S.Ct. at 1952.

It is true that *Ivan V.* was decided under the law of retroactivity as it existed before *Teague v. Lane.* But given what the Supreme Court said in *Winship* about the central and indispensable function of proof beyond a reasonable doubt in our system of criminal justice, it is inconceivable that the result in *Ivan V.* would have been any different under the *Teague* test. The requirement of proof beyond a reasonable doubt in criminal cases is clearly a procedure that is "implicit in [our society's] concept of ordered liberty".[19]

So how is it, then, that a number of federal and state courts have concluded that, under the *Teague* test, they are not required to extend full retroactive application to the "proof beyond a reasonable doubt" component of *Apprendi* and *Blakely?*

**16.** *Id.*, 397 U.S. at 362, 90 S.Ct. at 1071.

**17.** *Id.*

**18.** *Id.*, 397 U.S. at 362, 90 S.Ct. at 1072.

**19.** *Teague,* 489 U.S. at 307, 109 S.Ct. at 1073.

The answer is found in passages like this one:

> *Apprendi* is about sentencing only. For *Apprendi* concerns to come into play, a criminal defendant must already have been found guilty of the underlying crime. A defendant raising an *Apprendi* claim . . . is simply complaining that he received a sentence in excess of the normal sentencing range, without the fact or facts necessary to permit such sentence having been proven to a jury beyond a reasonable doubt. . . . Thus an *Apprendi* violation does not mean that a defendant is imprisoned on "a charge never made . . . and never heard by the jury." The most that can be said is that an *Apprendi* violation results in a defendant's imprisonment on a charge one element of which—the sentencing enhancement—was not proven to a jury beyond a reasonable doubt. The Supreme Court has already held that "failure to submit [an] element of" a crime to a jury may constitute harmless error[. *See* ] *Neder v. United States*, 527 U.S. 1, 19–20, 119 S.Ct. 1827, 1839, 144 L.Ed.2d 35, 53 (1999). . . . We decline to hold that an *Apprendi* violation comprises such constitutional "bedrock" as to require retroactive application. . . .

*People v. De La Paz*, 204 Ill.2d 426, 274 Ill.Dec. 397, 791 N.E.2d 489, 495–96 (2003).

And in passages like this one:

> We do not believe that requiring the jury to make drug quantity determinations beyond a reasonable doubt will greatly affect the accuracy of convictions. Nor is this rule a bedrock procedural element. [T]he existence of a drug violation was established beyond a reasonable doubt. The alleged *Apprendi* error only concerns an enhancement of the defendant's sentence based on a drug quantity finding by the judge. Therefore, the accuracy of the underlying conviction is not at issue.
>
> . . .
>
> [In addition], Sanchez–Cervantes' argument is flawed because not every extension of *Winship* is necessarily a watershed rule of criminal procedure. The rules announced in *Winship* and *Mullaney* [v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975),] were given retroactive effect because they were to "overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts[.]" The application of *Apprendi* only affects the enhancement of a defendant's sentence once he or she has already been convicted beyond a reasonable doubt. Therefore, it does not rise to the level of importance of *Winship* or *Mullaney*. Allowing the judge to determine the quantity of drugs for sentencing purposes does not impair the jury's ability to find the truth regarding whether the defendant possessed, distributed, or conspired to distribute some amount of drugs.

*United States v. Sánchez–Cervantes*, 282 F.3d 664, 669, 671 (9th Cir.2002).

In other words, the courts that have declined to extend retroactive effect to *Apprendi* and *Blakely* rely on the following reasoning: (1) When an issue of fact will determine whether the government has proved the elements of a crime, proof beyond a reasonable doubt is crucially important. But (2) when an issue of fact is merely a sentencing factor that will determine the defendant's maximum punishment, proof beyond a reasonable doubt is not so important. Thus, (3) even though *Ivan V.* holds that a defendant who has been *convicted* under a lesser standard of proof can obtain relief, no matter when the defendant's conviction was entered, a defendant whose maximum sentence has been increased under a lesser standard of proof is not entitled to relief if the defendant's conviction was already final when *Apprendi* and *Blakely* were decided.

That is to say, these courts have concluded that the due process guarantee of proof beyond a reasonable doubt is not so important when the factual issue being litigated affects only the authorized extent of the defendant's punishment—when the disputed fact is only a "sentencing factor" rather than an "element" of the offense.

I believe that this reasoning is flawed. The dichotomy that these courts rely on—the distinction between "elements" of a crime and "sentencing factors"—is the very dichot-

omy that the Supreme Court rejected in *Apprendi, Blakely*, and *United States v. Booker*.[20]

In *Apprendi, Blakely*, and *Booker*, the Supreme Court repeatedly declared that the distinction between "elements" and "sentencing factors" is irrelevant when assessing a defendant's Sixth Amendment right to jury trial—a right which, under *Sullivan v. Louisiana*, necessarily includes the right to demand proof beyond a reasonable doubt.[21] *Apprendi, Blakely*, and *Booker* stand for the proposition that when the resolution of an issue of fact will determine the authorized extent of the defendant's punishment, the defendant is entitled to demand that this fact be proved beyond a reasonable doubt—regardless of whether, under state law, this issue of fact is labeled an "element" or a "sentencing factor".

This point is explained at length in this Court's recent decision in *State v. Dague*, 143 P.3d 988 (Alaska App.2006). To summarize that discussion:

The Supreme Court declared in *Apprendi* that the distinction between elements and sentencing factors "does not provide a principled basis" for deciding whether defendants are entitled to a jury trial on particular issues of fact.[22] That is, the Court declared that the Sixth Amendment right to jury trial does not hinge on whether a particular issue of fact is properly labeled an "element" or a "sentencing factor". Instead, the Court adopted what it called a "functional" test: regardless of how a particular issue of fact is classified under state law, a defendant has a right to demand that this fact be decided by a jury, and a right to demand that the fact be proved beyond a reasonable doubt, if resolution of this issue of fact against the defendant will subject the defendant to a greater maximum punishment than would otherwise be authorized by a jury verdict that did not encompass this fact.[23]

As Justice Scalia put it in *Blakely*, the test is whether the defendant's sentence was authorized by "the jury's verdict alone" or, instead, the sentencing court "acquire[d] [its] authority only upon finding some additional fact" beyond those found by the jury.[24]

Justice Stevens returned to this theme—that the labels "sentencing factor" and "element" are irrelevant for Sixth Amendment purposes—in *United States v. Booker*.[25] The key problem addressed in *Apprendi* and *Blakely*, Justice Stevens said, was the erosion of the jury's traditional role in determining a criminal defendant's level of guilt, as more and more states (and the federal government) adopted determinate sentencing schemes—sentencing schemes that gave judges the power to resolve the factual disputes that would determine the upper limit of the defendant's punishment:

It is quite true that[, under indeterminate sentencing schemes,] judges commonly determined facts justifying [their] choice of a heavier sentence.... [But in] 1986, [we] first recognized a new trend in the legislative regulation of sentencing[: sentencing laws under which] facts selected by legislatures ... not only authorized, or even mandated, heavier sentences than would otherwise have been imposed, but increased the range of sentences possible for the underlying crime....

The effect of the increasing emphasis on facts that enhanced [the permitted] sentencing ranges ... was to increase the judge's power and diminish that of the jury. It became the judge, not the jury, that determined the upper limits of sentencing, and. the facts [that] determined [the sentencing range] were not required to be raised before trial or proved by more than a preponderance [of the evidence].

*Booker*, 543 U.S. at 236, 125 S.Ct. at 751 (citations omitted).

---

**20.** *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

**21.** *Sullivan*, 508 U.S. 275, 278, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993).

**22.** *Apprendi v. New Jersey*, 530 U.S. 466, 476, 120 S.Ct. 2348, 2355, 147 L.Ed.2d 435 (2000).

**23.** *Id.*, 530 U.S. at 494, 120 S.Ct. at 2365.

**24.** *Blakely*, 542 U.S. at 305, 124 S.Ct. at 2538.

**25.** 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

Justice Stevens explained that, given this development in sentencing law, "the Court was faced with the issue of preserving [the] ancient guarantee [of jury trial] under a new set of circumstances":

> The new sentencing practice forced the Court to address the question [of] how the right of jury trial could be preserved [so that it would continue to guarantee], in a meaningful way[,] ... that the jury would still stand between the individual and the power of the government under the new sentencing regime.

*Booker,* 543 U.S. at 237, 125 S.Ct. at 752.

The answer, as explained in *Apprendi* and *Blakely,* was to interpret the Sixth Amendment so as to guarantee a right of jury trial, and a right to demand proof beyond a reasonable doubt, on any issue of fact which, if proved, "increases the penalty for the [defendant's] crime beyond the [otherwise] prescribed statutory maximum".[26]

Justice Scalia summed up this jurisprudence in his concurring opinion in *Ring v. Arizona:* "[T]he fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by the jury beyond a reasonable doubt." *Ring,* 536 U.S. at 610, 122 S.Ct. at 2444.

*Apprendi, Blakely,* and *Booker* are all premised on the constitutional precept that if the resolution of an issue of fact will subject a criminal defendant to an increased range of penalties, then regardless of what label the government might attach to this issue of fact, it is fundamentally unfair (for purposes of the due process clause of the Fourteenth Amendment) to allow this issue to be decided using a less rigorous standard of proof than "beyond a reasonable doubt".

As I explained above, many courts have refused to extend retroactivity to *Apprendi* and *Blakely* because they concluded that a defendant's right to demand proof beyond a reasonable doubt is somehow less important when the disputed issue goes "only" to the defendant's range of sentences. This approach is fundamentally contrary to *Apprendi* and *Blakely.*

The flaw in these courts' reasoning is demonstrated by the fact that even when issues of fact are labeled "elements" of a crime, these elements perform two functions. In some circumstances, the proof or absence of an element will distinguish between defendants who should be declared innocent and those who should be declared guilty. But often, the proof or absence of an element will distinguish between defendants who should be found guilty of a lesser degree of crime and those who should be found guilty of a higher degree of crime.

In this latter circumstance, even though the disputed issue of fact may be called an "element", it functions much like a sentencing factor. If the government fails to prove the disputed fact, the defendant will not be acquitted, but the defendant will face a lower range of penalties for the criminal conduct. If the government succeeds in proving the disputed fact, then the defendant will be found guilty of the higher degree of crime and will, as a consequence, face a higher range of penalties.

No one would suggest that, in such circumstances, a defendant's right to proof beyond a reasonable doubt is somehow less important because, regardless of how the disputed element is decided, the defendant will properly be found guilty of *some* degree of crime.

But this, in essence, is the reasoning employed by the courts that have refused to extend retroactive application to *Apprendi* and *Blakely.* These courts have declared that the guarantee of proof beyond a reasonable doubt is less precious when the disputed issue of fact will not determine whether the defendant is guilty or innocent, but will instead determine only the defendant's range of punishment. This analysis is fundamentally at odds with the Supreme Court's decisions in *Apprendi, Blakely,* and *Booker.*

---

**26.** *Booker,* 543 U.S. at 231, 125 S.Ct. at 748 (quoting *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362–63).

As Justice Stevens explained in *Booker*, the guarantee of jury trial—with its concomitant guarantee of proof beyond a reasonable doubt—was being eroded by the enactment of determinate sentencing schemes under which the jury's verdict at trial would subject the defendant to a limited range of sentences, and then the judge's decision at the sentencing hearing might subject the defendant to a much more severe penalty.

As noted in the majority opinion, a first felony offender convicted of first-degree sexual assault or first-degree sexual abuse of a minor faced a maximum sentence of 8 years' imprisonment under the pre-March 2005 version of Alaska's presumptive sentencing law—unless the State proved one or more aggravating factors at sentencing, in which case the defendant's maximum sentence became 40 years' imprisonment.[27] Similarly, a first felony offender convicted of armed robbery faced a maximum sentence of either 5 or 7 years' imprisonment—unless the State proved one or more aggravating factors at sentencing, in which case the defendant's maximum sentence became 20 years' imprisonment.[28]

In other words, when it came down to assessing the defendant's actual jeopardy for a criminal offense, and the effect that a criminal conviction would have on the defendant's life and liberty, it was often more important for the defendant to prevail at the sentencing hearing than it was for the defendant to prevail at trial. *Apprendi, Blakely*, and *Booker* all stand for the proposition that it is fundamentally unfair to subject a defendant to such increases in punishment unless the factual issues that trigger the greater penalty are proved beyond a reasonable doubt.

Thus, the courts that have refused to extend retroactive application to *Apprendi* and *Blakely* are wrong when they declare that proof beyond a reasonable doubt is a crucial component of due process only when the issue being litigated is an element of the offense, and that proof beyond a reasonable doubt is not so important when the issue being litigated is "merely" a sentencing fac-

tor that determines the defendant's maximum penalty for the offense.

See the dissenting opinion of Judge O'Scannlain in *Bockting v. Bayer*, 418 F.3d 1055, 1057 n. 2 (9th Cir.2005): "Of course, *Blakely* relates to the accuracy of sentences, not underlying convictions. [But] I do not see how [this] difference can be material, ... when the point of *Blakely* and the entire line of jurisprudence stemming from *Apprendi* is precisely that sentencing factors must be treated as [the equivalent of] elements of a crime when they increase the defendant's maximum sentence."

It is true, as many courts have pointed out, that when the *Teague* decision describes the types of rules that fall within the retroactivity exception for "procedures that are implicit in the concept of ordered liberty", *Teague* paraphrases this exception as encompassing only rules that enforce "bedrock procedural elements [whose absence will] vitiate the fairness of a particular *conviction* ". 489 U.S. at 311, 109 S.Ct. at 1076 (emphasis added). The *Teague* decision also paraphrases this retroactivity exception as encompassing only rules which, if breached, will "seriously diminish[ ]" "the likelihood of an accurate *conviction* ". *Id.*, 489 U.S. at 313, 109 S.Ct. at 1077 (emphasis added).

The courts that refuse to apply *Apprendi* and *Blakely* retroactively often rely on this language—in particular, the Supreme Court's references to "conviction"—to bolster their conclusion that proof beyond a reasonable doubt is not so important when the factual issues being litigated only affect the defendant's maximum sentence.

But the Supreme Court's references to a "conviction" were obviously not spoken with *Apprendi* and *Blakely* in mind—since *Teague* was decided eleven years before *Apprendi*. More importantly, even though the Supreme Court spoke of ensuring the fairness and accuracy of a "conviction", it appears that the Supreme Court was simply using the word "conviction" as a shorthand for the true rule: ensuring the fairness and accuracy of every factual determination required to establish

---

**27.** Former AS 12.55.125(i) (pre-March 2005 version).

**28.** Former AS 12.55.125(c) (pre-March 2005 version).

the defendant's guilt *and* range of punishment.

Courts have traditionally used a similar shorthand when they describe the rule for determining whether a defendant is entitled to a new trial based on newly discovered evidence. For instance, both the Alaska Supreme Court and this Court have repeatedly stated that, in order to gain a new trial, the defendant must prove that the newly discovered evidence would "probably produce an acquittal".[29]

But this is not the true rule. Defendants are in fact entitled to a new trial if they show that the newly discovered evidence would probably affect the jury's verdict in *any* way favorable to the defendant—even if there is little chance that the jury would acquit the defendant altogether. *See In re Clark*, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 519, 541 nn. 32–33, 855 P.2d 729, 739, 761 nn. 32–33 (1993) (phrasing the test as whether the new evidence "point[s] unerringly to innocence or reduced culpability"); *Summerville v. Warden, State Prison*, 229 Conn. 397, 641 A.2d 1356, 1375 (1994) (quoting the California Supreme Court's language in *In re Clark* with approval); *Bellmore v. State*, 602 N.E.2d 111, 121 (Ind.1992) (stating the test as whether the new evidence "would probably produce a different result"); *State v. Vance*, 714 N.W.2d 428, 444 (Minn.2006) (stating the test as whether "the evidence will probably result in either an acquittal or a more favorable result for the defendant"); *Yorke v. State*, 315 Md. 578, 556 A.2d 230, 235 (1989) (stating the test as whether the new evidence would have "produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected").

In particular, courts will grant a new trial if the newly discovered evidence establishes a substantial probability that, even though the jury would have convicted the defendant, the jury would not have voted for the death penalty. *State v. Herrera*, 176 Ariz. 21, 859 P.2d 131, 137 (1993); *In re Clark*, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 541 nn. 32–33, 855

P.2d 729, 761 nn. 32–33 (1993); *Miller v. State*, 380 Md. 1, 843 A.2d 803, 808–09 (2004).

Just as the test for granting relief based on newly discovered evidence is not limited to evidence that would probably produce an "acquittal", the *Teague* exception for new rules that establish "procedures ... implicit in the concept of ordered liberty" must not be confined to procedures that ensure the fairness and validity of the defendant's "conviction". Rather, this exception encompasses all procedures that ensure the fairness and validity of judicial findings regarding the defendant's level of culpability—including the findings that will determine the defendant's maximum sentence.

This interpretation of *Teague* is confirmed by the Supreme Court's decision in *Graham v. Collins*, 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993). The defendant in *Graham* had been sentenced to death in Texas; he sought federal habeas corpus relief, arguing that Texas law improperly limited his ability to present mitigating information to the jury that ultimately decided to condemn him to death. The Supreme Court concluded that Graham was arguing for a "new rule"— that is, a procedural right that was not clearly granted by the Court's prior decisions in this area. The Court then concluded that Graham's proposed rule did not meet the second *Teague* exception to the bar on retroactivity.

[The *Teague* exception is limited to] such procedures [as] would be ... central to an accurate determination of innocence or guilt.... [*Teague*,] 489 U.S. at 313, 109 S.Ct. at 1077. We do not believe that denying Graham special jury instructions concerning his mitigating evidence of youth, family background, and positive character traits "seriously diminish[ed] the likelihood of obtaining an accurate determination" in his sentencing proceeding. Accordingly, we find the second *Teague* exception to be inapplicable....

*Graham*, 506 U.S. at 478, 113 S.Ct. at 903.

For present purposes, the important thing is not that the Supreme Court denied Gra-

---

**29.** *James v. State*, 84 P.3d 404, 406 (Alaska 2004); *Salinas v. State*, 373 P.2d 512, 514 (Alaska 1962); *Lewis v. State*, 901 P.2d 448, 450 (Alaska App.1995); *Charles v. State*, 780 P.2d 377, 383 (Alaska App.1989).

ham relief. Rather, the important thing is how the Supreme Court handled Graham's claim. The Court did not tell Graham that his claim failed the *Teague* test because any potential flaw related only to the jury's decision to impose the death penalty, rather than to the jury's decision to convict Graham. Rather, the Supreme Court denied relief to Graham because the Court concluded that, even if Texas might have been required to let Graham present the mitigating evidence he wanted, the failure to honor this purported procedural right did not "seriously diminish[ ] the likelihood of obtaining an accurate determination in [*Graham's* ] *sentencing proceeding.*" (Emphasis added)

Similarly, in *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), even though the Supreme Court quoted *Teague's* language about ensuring the accuracy of a "conviction", *Id.,* 542 U.S. at 352, 124 S.Ct. at 2523, the Court was in fact dealing with the fairness of a sentencing procedure. The factual issues being litigated in *Summerlin* would determine, not the defendant's guilt or innocence, but . rather whether the defendant would be subjected to capital punishment. *Id.,* 542 U.S. at 350, 355–58, 124 S.Ct. at 2521, 2524–26.

In other words, the second *Teague* exception is not limited to rules that ensure the fundamental fairness and accuracy of a defendant's conviction. This exception also encompasses rules that establish procedures to ensure the fundamental fairness and accuracy of the findings of fact that determine the defendant's level of punishment.

For these reasons, I conclude that *Teague* allows retroactive application of rules of procedure that ensure the fundamental fairness of the judicial decision-making governed by *Apprendi* and *Blakely*—*i.e.,* decisions regarding the facts that determine a defendant's maximum punishment. And the requirement of proof beyond a reasonable doubt is a rule that ensures the fundamental fairness of these decisions.

In this context, the "fairness" and "accuracy" of a decision means something different from the factual accuracy of that decision. As explained in this Court's majority opinion, the "accuracy" of a verdict in a criminal case does not necessarily mean that the verdict accurately reflects the true facts of the incident being litigated. Rather, as the Alaska Supreme Court explained in *Shaw v. Department of Administration,* 861 P.2d 566 (Alaska 1993), our law's insistence on the principle of proof beyond a reasonable doubt actually entails *sacrificing* the goal of accurate fact-finding in favor of a more important goal: the goal of precluding the government from inflicting criminal penalties on a defendant when there is a reasonable possibility that the defendant did not do the things that would make the defendant subject to those penalties. *Id.* at 571.

Thus, an "accurate" verdict in a criminal case is a verdict that preserves this latter principle: the principle that no criminal penalty shall be inflicted in the absence of proof beyond a reasonable doubt of all the facts necessary to authorize that punishment.

In *Ivan V. v. City of New York,*[30] the United States Supreme Court extended full retroactivity to the constitutional requirement that all facts necessary to establish the defendant's guilt be proved beyond a reasonable doubt. Now that *Apprendi* and *Blakely* have clarified that this same requirement of proof beyond a reasonable doubt applies equally to the facts that are necessary to establish the defendant's maximum punishment, I see no principled reason to refuse retroactive relief to defendants who were denied this right. It is fundamentally unfair to keep a defendant in prison for years—perhaps for decades—longer than the otherwise authorized presumptive term of imprisonment when the government has never proved the facts that authorized the longer sentence beyond a reasonable doubt.

I therefore conclude that *Blakely* must be accorded full retroactivity under the *Teague* test.

---

**30.**   407 U.S. 203, 204–05, 92 S.Ct. 1951, 1952, 32   L.Ed.2d 659 (1972).